## PARMALEE *vs.* WILKS and others.

The plaintiff, being the owner of a raft of saw logs, lying at Port Maitland, Canada, made a contract with the defendants, who were the owners of a steamboat, by which it was agreed that the defendants would come to Port Maitland on the next Tuesday morning, with the steamboat, and would proceed up the river about five miles to D. and there land her passengers, and immediately return to Port Maitland and take the plaintiff's raft in tow and tow it to Black Rock, a distance of about 40 miles, which the steamboat could traverse in about fourteen hours, with the raft in tow. The usual time for the arrival of the steamboat at Port Maitland, upon her trips up, was 3 o'clock in the morning, and it generally took about two hours to proceed to D., land her passengers

Parmalee *v.* Wilks.

and return to Port Maitland. On Tuesday morning the weather was fair and the lake and river were calm, and so continued through the day. But the boat failed to call for the raft, according to the agreement. In the evening, at about sunset, she returned, and took the raft in tow, for Black Rock. During the night a storm arose, and the raft went to pieces and was scattered along the shore. *Held* that, had the defendants entered upon the performance of their contract at the time specified, and used proper diligence in attempting to perform it, the plaintiff would have taken all the risk of storms or other casualties. But that, as the defendants delayed for some 14 hours to enter upon the performance of the contract, and as such delay resulted in the raft being overtaken by the storm, the defendants were responsible for the consequences. That when they took the raft in tow in the *evening* instead of the *morning*, as agreed, they took the risk of any storm that should arise after a sufficient time had elapsed for towing the raft to Black Rock if they had commenced the towing in the morning.

*Held also*, that the plaintiff had the right to fix the time in the contract; and to make it an essential part of the contract. That considering the dangers of navigation upon the lake, and the peculiar nature and condition of the plaintiff's property, he might determine when the voyage should commence, and make a special agreement to that effect. And, that upon the non-performance of the agreement, at the time specified, the party in default was liable for the damages resulting from causes which would not have arisen, had the agreement been performed.

A few days after the raft was thus broken up by the storm, the defendants agreed that if the plaintiff would collect the logs together, into rafts fit for towing, the defendants would take the logs in tow and tow them to Black Rock; *Held* that the expenses necessarily incurred by the plaintiff in collecting the logs and forming them into rafts, might be taken into the account, in estimating the damages arising from the breach of the contracts.

If property is exposed to imminent danger, it is not a violation of the statute prohibiting labor on the sabbath, to preserve it on Sunday, and remove it to a place of safety.

APPEAL from a judgment entered upon the verdict of a jury. The questions were raised by exceptions taken by the defendants. The trial was had at the Erie county circuit, in September, 1854. The facts and exceptions sufficiently appear in the opinion.

*Geo. B. Hibbard*, for the plaintiff.

*D. Tillinghast*, for the defendants.

Parmalee *v.* Wilks.

*By the Court,* MARVIN, J. In June, 1851, the plaintiff owned a raft of saw logs which was at Port Maitland, upon the Canada side of Lake Erie, at the distance of forty-two miles from Black Rock, in New York. He made a contract on Saturday with the defendants, who were the owners of the steamboat Experiment, by which it was agreed that the defendants would come to Port Maitland, on the next Tuesday morning, with the steamboat Experiment, and would proceed up the river about five miles to Dunville Dam, and there land her passengers and immediately return to Port Maitland, and take the plaintiff's raft in tow and tow it to Black Rock. The plaintiff was to pay and did pay $100 for the services to be performed. The contract was made at Port Maitland, and the plaintiff at the time notified the defendants that, relying upon their performance of the contract, he should leave Port Maitland on Monday evening and go to Black Rock. It was shown by the evidence that the usual time for the arrival of the steamboat at Port Maitland, upon her trips up, was 3 o'clock in the morning, and that it would take about two hours to proceed to Dunville Dam, land her passengers and return to Port Maitland. On Tuesday morning the weather was calm, and the lake and river were calm; there was little wind, and no indication of wind, and the weather so continued through the day. The plaintiff left one Leach, who was in his employ, to get the raft together and to come down with it, and he and another man in the employ of the plaintiff were on the raft during Tuesday, at work for the plaintiff. The Experiment, that morning, passed up by the raft just at break of day. Leach remained upon the raft all day and saw nothing more of the boat till evening, when she returned and took the raft in tow about sunset and started with it in the regular channel for Black Rock. About 11 o'clock the wind arose, and increased until 1 o'clock, when it was blowing very hard. The water was very rough, and there was a heavy sea running, and the raft went to pieces from the force of the storm. It was scattered along the shore of a place called Long Beach, ten miles below Port Maitland, and was so scattered along the shore for twenty miles. It was shown that

the steamer would tow the raft at a speed of from two to three miles an hour.

Subsequent proceedings were taken by the parties, touching the logs, which will be hereafter stated. Let us at this point ascertain the rights of the parties under the contract, and the facts disclosed. That there was a breach of the contract made by the parties, cannot be successfully denied. That breach was in not taking the raft in tow on the *morning* of Tuesday, instead of the evening; and the important question is, what damages is the plaintiff entitled to for this breach of the contract. On the part of the defendants it is insisted that the plaintiff is only entitled to nominal damages ; that time was not of the essence of the contract. It may be conceded that the precise time when a thing is to be done is not generally essential, provided the thing to be done be performed, and that in such case the measure of damages is the loss or injury sustained by the delay in performing the agreement. Thus, had the defendants in fact towed the raft safely through to Black Rock, and then delivered it some fourteen hours after it would have been delivered—had they entered upon the performance of their contract according to its terms—their liability for the breach of their contract, and the measure of damages, would have only been what the plaintiff had lost by their delay ; and this would probably have been merely nominal, or a trifle more. There was, however, no performance of the agreement. To present the question simply, I may as well say here, that the defendants were not common carriers, and were not liable as such. They are liable simply for a breach of their contract, and the question is for how much damages are they liable. Had they entered upon the performance of their contract at the time specified, and used proper diligence in attempting to perform it, the plaintiff would have taken all the risk of storms or other casualties. But as the defendants delayed for some fourteen hours to enter upon the performance of the contract, and as such delay resulted in being overtaken by the storm, are not the defendants responsible for the consequences ? In other words, did they not, when they took the raft in tow in the evening, instead of the morning, as agreed,

Parmalee *v.* Wilks.

take the risk of any storm that should arise after a sufficient time had elapsed for towing the raft to Black Rock, if they had commenced the towing in the morning? In my opinion they did; and the trial proceeded upon this principle. This cause had been previously tried and a new trial had been granted. Upon granting the new trial, Justice MULLETT remarked in his opinion : " It may be stated as a general proposition, which seems to commend itself to our sense of justice, that the person who sustains an injury by the default or misconduct of another in the performance of a legal duty, is entitled to recover of that other a compensation for all the injury he has sustained, as the immediate and direct result of such default or misconduct at the time. (*Sedg. on Dam.* 62, 63.) In the case under consideration, the defendants were bound by their contract to take the plaintiff's raft in tow at Port Maitland, where he had left it for that purpose in the morning, and to proceed with it with reasonable diligence to Black Rock, where the plaintiff had gone probably to receive it. The distance from Port Maitland to Black Rock, according to the proof, is not more than forty-two miles, and the time necessary for the boat to perform that trip, in suitable weather, with the raft in tow, was but about fourteen hours; the defendants did not take the raft in tow until sunset, and if the disaster which overtook the raft on the passage was the immediate and direct result of the defendants' delay in commencing the voyage, it appears to me that the defendants would be liable for the damage sustained by the plaintiff as the result of the violation of their contract."

It will be seen that the contract was very specific. The defendants were to come to Port Maitland the next Tuesday morning with the steamboat Experiment, and then proceed to Dunville Dam and there land her passengers, and then return immediately to Port Maitland and take the raft in tow and tow it to Black Rock. The parties knew the time in the morning when the boat usually arrived at Port Maitland, and the time it would require to go to Dunville Dam and return. Usually the boat would be at Port Maitland, on her return from the dam, about 5 o'clock, and this was about the time she would have been at

Port Maitland and taken the raft in tow upon the morning of Tuesday, had she simply proceeded to the Dunville Dam and then immediately returned. But she ran further up the river, and did not return until night.

We should keep in mind the contract, and the subject to which it related, and the condition in which the subject was. The subject was a quantity of saw logs, rafted together and lying in the river or harbor. This raft, when brought out of the river into the lake, could not be taken back into the river without the aid of other power. It could not be navigated and managed by men upon it. Once in the lake, it would be at the mercy of the winds and waves, and in a storm must go to pieces or be driven ashore. In short, it was necessary that it should be taken in tow by a boat capable of moving it in the proper direction, and then, in case of a storm before it was taken to a place of safety, it would probably be torn to pieces and scattered upon the surface of the lake until the logs should be driven ashore. Now all these facts and risks were well known to the parties making the contract. This is not all; those who have experience upon the lake are capable of forming opinions, more or less correct, as to the state of the weather upon the lake, for a day or two ahead; especially in the summer season. The owner of a raft of logs which lies securely in a river or harbor, and who wishes them moved upon the lake to some other place, may exercise his judgment and decide that he will have them towed at a certain time, and make his contract with those who tow rafts, to take it in tow at a certain hour, at which time he will have it out of the river, in the lake, so that the boat can take it in tow. If the boat appears at the time and takes the raft in tow, the risks of navigation and storms are with the owner of the raft, assuming that the boat owners perform their duty with proper diligence. But suppose the owner of the raft, relying upon his contract, drops his raft down from the river into the lake, and the boat should fail, entirely, to come and take the raft in tow, and the owner of the raft could procure no other boat, and a storm should arise and his property should be destroyed, he doing all in his power to protect and save it; will

Parmalee *v.* Wilks.

it be pretended that the boat owners are not liable for all the damages the owner of the raft has sustained, which would have been avoided had the boat owners performed their agreement? It seems to me not. In the case under consideration the contract was specific; the raft was to be taken in tow *in the morning*. The plaintiff informed the defendants that he should leave Port Maitland Monday evening and go to Black Rock. He did so, leaving men in charge of the raft, to get it together and come down with it. These men were upon the raft working for the plaintiff, and they saw the boat pass up just as day was breaking. Had the boat taken the raft in tow at 5 or 6 o'clock in the morning, there can be no reasonable doubt that the voyage would have been performed in safety. From the evidence, it appears that the boat with the raft in tow, in good weather, could make from two to three miles an hour. This would have given 17 or 18 hours before the storm commenced, and 19 to 21 before the raft went to pieces. The court charged the jury that if they found that the raft would have been overtaken by the storm and injured, if the steamboat had taken the raft in tow and started in the morning, then the defendants were not liable for any injury that did happen, provided such injury would have happened, had the boat taken the raft at the time agreed upon; that if the defendants had taken the raft in tow at the time agreed upon, the plaintiff would have taken the risk of storms. In my opinion, the principle here presented was the true one, or, at any rate, quite as favorable to the defendants as they had a right to ask. It authorized the jury to consider the evidence, and to say whether the storm would have overtaken the raft, had it been taken in tow in the morning; and, if so, whether it would have been injured, and for such injury the defendants would not be liable. I am not clear that this rule was not too favorable to the defendants. Their counsel had requested the court to charge that if the jury found that the raft would have been overtaken by the storm and *injured*, if the boat had taken the raft in tow and started in the morning, then the defendants were not liable for the injury to the raft. The charge was not given in this form. Had it

been, and the jury had found that the storm would have over-taken the raft and *injured* it, though in a trifling degree, then they would have been instructed to give no damages, though by the injury which did happen the raft was lost.

The counsel for the plaintiff has likened this case to the case of a *deviation* from the voyage, and I am not prepared to say that the principles, as settled in those cases, are not applicable to this case. I have no doubt there was a deviation in the de-lay to enter upon the voyage of towing. The time for com-mencing the voyage was fixed with much precision. Suppose the plaintiff, on going to Black Rock, had effected an insurance upon the raft, specifying in the contract that the steamer Ex-periment was to take the raft in tow Tuesday morning and tow it to Black Rock. It will not be contended, under the facts of this case, that the insurers would have been liable. The delay of the steamer in taking the raft in tow, would discharge the insurers. The plaintiff's counsel has cited numerous authori-ties. I shall not cite them here. In my opinion the defend-ants, by their delay, took the risk of the storm which arose and scattered the raft. Had they performed their agreement, the injury would not have happened. The plaintiff had the right to fix the time in the contract, and to make it an essential part of it. Cases are numerous, where the precise time when a thing is to be done is of the utmost importance, and unless it be then done, great damage may result from the omission or delay. It may be said that these are cases where it can be seen that if the thing to be done is not done, damages will nat-urally result from the omission to do the thing, and that in this case it could not be foreseen that any injury would result from the delay of fourteen hours, and that therefore the parties could not have regarded the time as material. This position is not satisfactory to my mind. Considering the dangers of naviga-tion upon the lake, and the peculiar nature and condition of the plaintiff's property, I think he had a right to determine when the voyage should commence, and make a special agree-ment to that effect; and in case such agreement should not be performed at the time specified, the party breaking the agree-

Parmalee *v.* Wilks.

·ment should be held liable for the damages which should result from causes which would not have arisen had the agreement been performed.

The plaintiff offered to prove that a few days after the raft was broken up the parties made another contract, by which it was agreed that if the plaintiff would collect the logs together, into a raft fit for towing, at Long Beach, the defendants would, at any time when the same was so fitted, upon the next day thereafter, which should be Sunday, Tuesday or Friday, take the logs in tow and tow them to Black Rock; that the plain· tiff collected the logs and fitted them for towing, at six different times, and at an expense of $50 each time, and immediately gave notice to the defendants each time. That the defendants failed to take the logs in tow at any of the times, as agreed, ex· cept the last. That the logs were broken up and scattered each time, except the last, by storms. That when the boat took the logs in tow, and had proceeded five or six miles, a storm arose, the tow line parted and the raft lay in the lake a day and night, and was finally nearly all lost, the boat saving a small portion of the raft after the storm was over. And that the weather was pleasant for a sufficient length of time, after the logs were collected, each time, except the last, to enable the defendants to tow the raft to Black Rock, provided the boat had appeared and taken the raft in tow, pursuant to the agree· ment. That the plaintiff gave notice to the defendants, after the first loss of the raft, and before the contract in relation to collecting the logs at Long Beach, that he would collect the logs together, and that he would not and did not intend thereby to discharge or decrease the liability of the defendants for the loss of the raft. The evidence so offered was objected to by the defendants' counsel, on the ground that it was not admissible under the pleadings; that the 2d, 3d and 4th counts stated no cause of action. Some other objections to the pleadings were made. The court admitted the evidence, and the defendants excepted. The defendants objected that the plaintiffs could prove but one neglect, and not four; also, that the agreement being to tow on Sunday, as well as Tuesday or Friday, was

illegal and void. These objections were overruled, and the defendants excepted.

Most of these objections are not now noticed in the defendants' points, and I shall not notice them all, and shall be brief upon others. The evidence offered was given.

The pleadings are not very clear or accurate; still I think them sufficient. No objection was made to the first count, so called. It concludes with the facts touching the original contract and the first loss. The second count states the agreement relating to the collecting of the logs together at Long Beach, &c., avers performance on the part of the plaintiff at an expense of $75, notice to the defendants, and an allegation that they failed to *deliver* the logs at Black Rock, &c. The other counts are substantially like the second. The counts are not artistically drawn. The pleader seems to have regarded the defendants as liable as common carriers. In my opinion, however, the pleadings were sufficient to justify the giving of the evidence. There is no question of surprise in the case. It is objected that there was no consideration for the second agreement, so called. There is no foundation for this objection. The defendants were to have $100 for towing the raft from Port Maitland to Black Rock, and this sum was paid to them. The truth is that all which was done after the first breaking up and scattering of the raft, was done for the benefit of the defendants, to relieve them from a liability for the entire raft. The raft was lost, the logs were scattered along upon the beach for twenty miles, and it does not appear that there was any market for them where they were. If they could be collected and taken to Black Rock, at an expense less than their value, something might be saved, and this would enure to the benefit of the defendants. The parties came to an agreement about the matter, and the plaintiff collected the logs. I see no objection to regarding this as having been done at the instance of the defendants. They must have desired to save as many of the logs as possible, so as to diminish the damages. It was necessary to collect the logs and fit them for towing, and in consequence of the neglect of the defendants to come with their

Parmalee *v.* Wilks.

boat when notified, and as they had promised, the act of collecting and fitting the logs for towing was necessarily repeated as they were from time to time scattered by the storms. I can see no objections to taking into the account the expenses necessarily incurred in collecting the logs, in estimating the damages. The court charged that if the plaintiff, relying upon the defendants' performance of the contract, made for towing the raft after the same was first scattered, had sustained expenses in and about collecting the same for towing, pursuant to the contract, then if the expenses had been lost to the plaintiff in consequence of the defendants not performing the contracts, the plaintiff was entitled to recover those expenses from the defendants. I think this instruction was proper. The court also charged, that upon the failure of the boat to go at the several times appointed and to take the raft in tow, the raft was at the risk of the defendants. As to the injury from storms against which the plaintiffs could not guard, and that the defendants were liable for injuries from storms, which injuries would not have happened had the defendants performed their agreement, I have already, in considering the liability arising from the breach of the original contract, remarked sufficiently upon this position.

The defendants' counsel presented numerous requests to charge, and upon refusal, excepted. Some of these have been already considered, and the principle upon which the trial was had and was given to the jury, have been sufficiently stated. It remains to notice some other exceptions. The counsel for the defendants requested the court to charge that the raft was at all times in the possession of the plaintiff, and that by leaving Leach in the possession of it, he constituted him his agent in reference to the towing the raft; and that Leach, not objecting to the defendants taking the raft in tow in the afternoon of Tuesday, the defendants were not liable for the injury it sustained in the storm. Refusal and exception. Leaving Leach in possession of the raft did not constitute him an agent of the plaintiff, to modify or change the contract which the plaintiff had made.

I do not think it necessary to notice any further the requests to charge, as the views already expressed, I believe, cover the whole ground and all the questions raised.

There was an objection to the evidence in relation to the contract touching the collecting the logs and the defendants commencing on the Sunday, Tuesday or Friday which should first come after the logs were collected, upon the ground that such contract was illegal, as touching labor on the sabbath. I do not think the question touching the performance of servile labor on Sunday, was necessarily involved; and if it was, I do not think that the case is embraced by the statute which prohibits servile labor or working, excepting works of necessity and charity. If property is exposed to imminent danger, I think it would not be unlawful to preserve it on Sunday, and remove it to a place of safety.

Upon the whole, I am not able to see any errors, of which the defendants can complain, and I think the judgment should be affirmed.

[ERIE GENERAL TERM, September 8, 1856. *Bowen, Greene* and *Marvin,* Justices.]