## FARWELL *vs.* DAVIS.

When a contract is made with an individual who is in fact a partner with others, and the contract relates to the business of the partnership, but these facts are not known to the other contracting party, in a suit on the contract against the one who made it, the nonjoinder of the other partners cannot be pleaded in abatement.

In an action to recover damages for the breach of a contract, made by the defendant, in his own name, for the transportation of iron, the defendant alleged that there was a partnership between him and one W., and that the agreement, if any, was made by them jointly, and insisted that W. should have been made a party. The plaintiff did not know that W. was a partner of the defendant. After the breach of the agreement, W. denied that he was a partner, and alleged that he was merely a consignee of the iron, and had no knowledge of any contract for transporting it. *Held* that the plaintiff had the right to sue the defendant alone, on the contract.

The defendant, on request, submitted to the plaintiff an offer, in writing, containing the terms upon which he would carry a quantity of iron from Brooklyn to Saginaw, viz.: that he would carry the same at $4.50 per ton, between the 15th of October and 25th of November, freight to be paid at Saginaw; and that if the iron was not ready by the 15th of October, he would extend the time to the 18th, adding three days to the time of delivery at Saginaw. This offer was accepted. *Held* 1. That this was a valid contract between the parties.

2. That it was a condition precedent to the obligation to carry that the plaintiff should deliver to the defendant the iron to be carried.

3. That it was absolutely essential that the iron should be actually delivered, if called for, or actually ready for delivery. That an order on the warehouseman would be a sufficient delivery, provided the warehouseman would deliver when called upon.

4. That if the defendant had called for the iron as early as the 19th of October, and it had not been delivered, and none was delivered until the 23d, there would have been a failure to perform the condition precedent, which would have justified the defendant in abandoning the contract; but that, to do that and entitle himself to carry upon an implied promise to pay him what it was worth, he should have disaffirmed the contract and refused to carry upon it.

5. That having received and conveyed the property, under the contract, the defendant could not demand, for his services, more than the contract price.

6. That the defendant having demanded more, and refused to deliver the property until the illegal claim should be satisfied, the plaintiff, after having paid such excess, under protest, was entitled to recover the same of the defendant.

7. That the defendant was also liable for the plaintiff's time and expenses in searching for the iron, and for payments made by him to satisfy liens acquired by other persons, thereon, which were the direct result of the defendant's breach of his contract.

Farwell *v.* Davis.

THIS action was brought to recover damages for breach of a contract, on the part of the defendant, to transport a quantity of iron for Paul, Farwell & Co., from Brooklyn, N. Y., to Saginaw, Mich.; and also to recover back the overcharges which the said firm were compelled to pay on said iron.

The plaintiff claimed and proved on the trial: That Paul, Farwell & Co., composed of Francis W. Paul, Thaddeus D. Estabrook, Henry C. Potter, and this plaintiff, were, in the fall of 1860, engaged in building a railroad in the state of Michigan. That on or about October 10, 1860, at the city of New York, the said firm, the plaintiff acting therefor, and the defendant, made a contract, whereby the defendant agreed to receive at New York or Brooklyn, between the 10th and 15th of October, 550 tons of iron, and transport the same to Saginaw, and there deliver the same on dock by November 25, at $4.50 per ton; and if the iron should not be ready on the 15th of October, then the defendant would extend the time to the 18th of October, adding three days on the time of delivery at Saginaw. The iron was in Mr. Wetmore's bonded warehouse, Brooklyn, and on the 18th of October an order on Mr. Wetmore was delivered to the defendant for the delivery of the same to him for transportation. This order was accepted and received by the defendant. The defendant entered upon the performance of such contract, but failed to transport any of such iron to Saginaw within the time agreed upon, or during that year. A portion of such iron was shipped by him, and arrived at Saginaw in the spring of 1861. The charges on a portion of this iron, for transportation, were $6 per ton as stated in the bills of lading thereof. The balance of the iron was never transported to Saginaw by the defendant, but was found by the plaintiff at Buffalo, in the fall of 1861. It was there held by the N. Y. & Erie Railway Co., subject to charges for transportation from New York, and one Wilkie also

made claim, as consignee, for commissions, &c. The defendant refused to transport the iron further; and to get possession of the iron, Farwell had to settle and pay the charges, as made up by Wilkie, which he did. In addition to these charges, the firm paid $1 per ton for the transportation of the iron from Buffalo to Saginaw. The amount so paid by the firm for the transportation of the iron from Brooklyn, N. Y., over and above the contract price of $4.50 per ton, was the sum of $703.12. The plaintiff claimed to recover this amount, with interest thereon; also, a reasonable amount for time and expenses of Farwell in getting the iron at Buffalo. Mr. Paul, a member of the firm, died before suit commenced, and Estabrook & Potter sold and transferred their interest in the firm to the plaintiff before suit commenced. The defendant alleged, and attempted to prove, a co-partnership between defendant and one Mortimer Wilkie, and insisted that said Wilkie should have been made a party to the action. That the iron was not delivered to the defendant till long after the 18th October, and it was then and there agreed by Farwell that the defendant should be paid $6 per ton on all iron transported by rail to Buffalo. That, in the summer of 1861, a settlement was made at Buffalo, between Farwell, Wilkie and defendant, of and concerning all matters connected with the transportation of said iron.

The jury rendered a verdict in favor of the plaintiff for the sum of $932, and judgment was entered thereon, from which judgment the defendant appealed.

The questions on this appeal arose on exceptions to the admission and exclusion of evidence, the motion for a nonsuit, and exceptions to parts of the charge to the jury, and to the refusal to charge as requested.

*J. T. Spriggs*, for the appellant.

*F. & W. Kernan*, for the respondent.

*By the Court*, MULLIN, J. The first question to be considered in this case is, whether on the facts proved the plaintiff alone can maintain the action? The contract for the transportation of the railroad iron was made by Farwell on behalf of the firm of Paul, Farwell & Co., that owned the iron to which the contract related. The firm consisted of Paul, Estabrook, Farwell and Potter. Potter transferred his interest in the claim against the defendant to Farwell, who thereby became owner of it. Estabrook assigned to the plaintiff all his interest in the contract for building the railroad, and on which the iron was to be used. This transfer vested in the plaintiff, not only the assignor's interest in the contract for constructing the road, but in everything pertaining to the work. Estabrook's connection with and interest in the enterprise was, as I understand Farwell, absolutely ended and determined, leaving in him no interest in the property of the firm of which he had theretofore been a member. Paul, the other partner, died before suit brought, and the right of action survived to the plaintiff, and the omission to describe himself as survivor cannot affect the plaintiff's right to recover in this suit.

The next question is, was Wilkie a necessary party defendant? The answer avers that he was a partner with Davis, and that the firm was doing business in New York in the name of Davis, by whom the contract alleged in this case was made. The general rule is that such a partner is a necessary party to a suit upon a contract entered into by his firm. But by the partnership articles it appears that each partner was bound to make all contracts relating to the copartnership business in his own name, so as to secure the other partner against liability as such to third persons, upon contracts made by the several partners; and that the partnership should exist between themselves only for the purpose of the division of the profits and losses. Such an agree-

ment did not protect either from liability upon the contract of the other; but when a contract was made by Davis in his own name and he is sued upon it alone, it does not become him to insist that Wilkie shall be joined with him, nor Wilkie to insist that he shall be made a co-defendant. The partners are taken at their word, they are treated by third persons as they intended and desired they should be, as individuals not united in interest; and they cannot insist that they shall be joined in an action on a contract made in the name of one of the partners only. But, however this may be, it is well settled that when a contract is made with an individual who is in fact a partner with others, and the contract relates to the business of the partnership, but these facts are not known to the other contracting party, in a suit on the contract, against the one who made it, the nonjoinder of the other partners cannot be pleaded in abatement. (*Collyer on Partnership,* § 719. *New York Dry Dock Company* v. *Treadwell,* 19 *Wend.* 525. *Peck* v. *Cowing,* 1 *Denio,* 222. *Van Tine* v. *Crane,* 1 *Wend.* 524.) Farwell testifies that he did not know that Wilkie was a partner, and that as late as June following the making of the contract, Wilkie denied that he was a partner of Davis, but on the contrary insisted he was a consignee of the iron only, and had no knowledge of any contract relating to the carriage of the iron. It seems to me too plain for argument that the plaintiff had the right to sue Davis alone, upon the contract.

Having disposed of these formal objections to the right of the plaintiff to recover, we come to the question whether there was in fact and in law a contract entered into between the plaintiff and the defendant for the carriage of the iron. The plaintiff and Howland both testify that the defendant was requested to and did submit to them an offer in writing containing the terms upon which he would convey the iron. These terms were to carry from Brooklyn to Saginaw at $4.50 per ton, 550

tons, between the 15th of October, and 25th of November, dangers of navigation excepted, freight to be paid at Saginaw. It was further stated in said offer that if the iron was not ready by the 15th of October the defendant would extend the time to the 18th, adding three days to the time for delivery at Saginaw. Farwell swears that he authorized Howland to accept said offer, and Howland testifies that he informed the defendant that it was accepted. The defendant, on the other hand, swears that his offer never was accepted, and that the iron was carried without any express contract in relation to it. The question whether the offer was accepted, was submitted to the jury and they have found that it was, upon conflicting evidence. For the purposes of the case this fact must be assumed as established; and being established, a valid contract was made between the plaintiff and the defendant, and that contract is contained in the offer made to and accepted by the plaintiff.

It was a condition precedent to the obligation to carry, that the plaintiff should deliver, or cause to be delivered to the defendant, the iron to be carried. Was this condition performed? The mere delivery of an order on the warehouseman for the iron was not such delivery as was contemplated by the contract. It was absolutely essential that the iron should be actually delivered if called for, or actually ready for delivery. An order on the warehouseman would be a sufficient delivery, provided the warehouseman would deliver when called upon; but if he should refuse to deliver, it would be impossible for the carrier to perform his contract. Crook was the vendor of the iron, Wetmore had it under his control, and it was on the 18th of October, the day the order was given to the defendant, in the ship Cutting, then, as I infer, in the harbor of Brooklyn. The order was on Wetmore. He testifies that the iron was in the warehouse on the 25th of October, and had

Farwell *v.* Davis.

been for six months. The order was presented on the 25th, and the iron was then ready and a boat load was delivered that day; another on the 26th. A boat came for iron on the 30th of October; he was ready to deliver the iron, but the boatman would not receive it. "We were," he says, "always ready to deliver the iron." The balance of the iron was delivered on the 2d of November. On cross-examination this witness testified, that the first day the defendant sent he was not ready to deliver the iron, but he is unable to designate the day. He says if the defendant had sent for the iron on the 18th it would have been delivered; the iron was ready on that day, and at all times, for delivery. He would not have delivered the iron without a permit. It would have taken five days to deliver the iron. By this I understand the witness to mean that they could only load one boat a day from the vessel. A boat load is 100 tons. On re-direct examination he testified that he could and did deliver as fast as the boats could take it. Evidence was given on the part of the defence tending to prove that on the morning of the 19th of October he called on Wetmore to ascertain when the iron could be delivered, and was told that it could not be delivered until some days thereafter; that he so informed the plaintiff's agent, and was told that he must do the best he could; that it was concluded between him and the plaintiff that the iron could not be got to Saginaw that fall by water, and part of it must therefore go by railroad, and the plaintiff assented, and agreed to pay the extra charges. The defendant sent boats on several days, for the iron, but got none. It does not appear that any complaint was made by the defendant to either the plaintiff or his agent that a permit had not been furnished; nor did Wetmore decline to deliver the iron on any such ground. It was for the jury to say, upon this evidence, whether it was true as Wetmore testified, that he was at all times, except on one occasion, ready and

willing to deliver the iron to the defendant; or whether, on the contrary, he neglected or refused on several occasions to deliver, and that in consequence thereof he was unable to perform his contract. The jury have probably found that the iron was ready, and that there was no delay in complying with the order for delivery.

If it were true that the defendant had called for iron as early as the 19th of October, and it had not been delivered, and that none was delivered until the 23d, there would have been a failure to perform the condition precedent, which would have justified the defendant' in abandoning the contract. But to do that, and to entitle himself to carry upon an implied promise to pay him what it was worth, he should have disaffirmed the contract and refused to carry upon it; then, if the plaintiff assented to his taking the iron, he would have been entitled to recover what his services were reasonably worth. But the jury found that he did not repudiate the contract, but on the contrary, by his omission to disaffirm, he must be held to have received the property and to have carried the same under it.

As the plaintiff did not insist upon recovering damages for not delivering the property in the fall of 1860, it does not become necessary to inquire whether, on the case made by himself, he was entitled to recover such damages. However that may be, it is quite clear that having received and conveyed the property under the contract, he could not demand for his services more than the contract price. He did demand more, and refused to deliver the property until the illegal claim was satisfied. The plaintiff paid such excess under protest, and for the amount thus paid he is entitled to recover.

Was the plaintiff entitled to recover for his time and expenses in searching for the iron, and getting it sent forward, and in settling with Wilkie? If the plaintiff was believed, he had the right to expect that the iron

Farwell *v.* Davis.

would be delivered at Saginaw in the fall of 1860. It was not delivered until the following summer. Where it was during the winter, he says he did not know; as a prudent man he searched for it, found it in the custody of another carrier and of an intermediate consignee, both of whom insisted upon a lien upon it for a larger amount of freight than he, by his contract, was bound to pay. The loss of time and expenses in this search were the direct result of the defendant's breach of his contract, and he should pay them. Had the property arrived at Saginaw charged with a higher rate of freight than was provided for in the contract, the plaintiff would have had no claim to recover of the defendant more than the sum so illegally demanded; or, if the defendant had refused, as he should have done, if the iron was not delivered at the time mentioned in the contract, to carry any part of it, the plaintiff could only recover what it would have cost him to have it carried, beyond the contract price. In neither of these cases would the plaintiff have incurred either loss of time or expense. But as the defendant treated the property, it was indispensable that the plaintiff should discover it and have it sent to its destination. In *Briggs* v. *The New York Central Railroad Co.* (28 *Barb.* 515,) it was held that in an action against a carrier for damages for not delivering property, the plaintiff would have been entitled to the expenses of an agent and team sent to the place where the goods were to be delivered, while waiting to receive them, if the defendant had been notified that an agent would be sent for that purpose. The qualification of the rule of damages was perhaps right on the facts of that case, but it can have no application to this case. Here it became indispensable by reason of the defendant's culpable violation of his contract that the property should be searched for, and if found sent to its destination. The defendant could not fail to

know that his neglect of duty would impose this burden on the plaintiff.

In *Driggs* v. *Dwight*, (17 *Wend.* 71,) the plaintiff sued to recover damages for not delivering to him possession of certain premises which the defendant let and leased to the plaintiff for one year. It was proved that the plaintiff removed his family to the premises leased, thereby increasing expense, but the defendant refused to allow the plaintiff to enter. These expenses the plaintiff sought to recover as part of his damages. The Court of Common Pleas, in which the action was tried, held that the plaintiff was entitled to recover these expenses. On error, the judgment was affirmed. Cowen, J., says: "The measure of damages was certainly not confined to the difference in rent." He held the expenses recoverable under the allegation of general damages in the declaration. That expenses, such as are claimed in this case, are recoverable as damages in an action for breach of the contract, see *Parmalee* v. *Wilks*, 22 *Barb.* 539; *Giles* v. *O'Toole*, 4 *Barb.* 261; *Durkee* v. *Mott*, 8 *id.* 423; *Lawrence* v. *Wardwell*, 6 *id.* 423; *Black* v. *Baxendale*, 1 *Welsb. Hurls. & Gord.* 410. This case is directly in point that the expenses are recoverable as damages in such an action as this. (*Williams* v. *Vanderbilt*, 29 *Barb.* 491.)

Was there an accord and satisfaction as to the plaintiff's claim for damages between him and the defendant, or between him and Wilkie acting as agent for, or partner of, the defendant? The charge of the court as to the effect of a settlement with Wilkie, was not excepted to, and hence no question can be raised here as to it. The defendant's counsel requested the court to charge that if there was a settlement made at Buffalo with Wilkie, as sworn to by him, it was as much a settlement with the defendant as if made with him personally, and the plaintiff was not entitled to recover. The court refused so to charge, on the ground that he had instructed the

jury on this point in terms which covered the request. To this refusal the defendant's counsel excepted. The charge on this branch of the case was, that if the settlement with Wilkie embraced the claim in question the plaintiff could not recover. If the claim of Wilkie, only, was settled, it did not bar the claim of the plaintiff. The charge covers the proposition embraced in the request, and therefore the court properly refused to upset it.

The defendant's counsel further requested the court to charge that the question between the plaintiff and Wilkie was in regard to the freight or charges from New York to Buffalo by rail, and the charges and statement of account furnished by Wilkie was of the railroad charges; if, therefore, there was a settlement at all, it was of the claim of the defendant for freight, and whether made by Wilkie as partner, agent or consignee, it was a settlement in all respects as if made by the defendant. This request was refused, and the defendant's counsel excepted. Wilkie swears that in order to induce the plaintiff to settle all the difficulties relating to freight and charges on the iron, he deducted from the amount of his bill $151.99. This the plaintiff denies, and the jury must have believed the plaintiff. Believing him, the whole ground-work of the accord and satisfaction is swept away, and the plaintiff is left with his claim in full force. But if this was not so, the jury might very well have found that the claim against the defendant was not settled with Wilkie. The plaintiff says he did not know that Wilkie and the defendant were partners; that Wilkie told him he held the property as consignee, subject to charges, and would not relinquish the property until they were paid. The charges to which the property was thus subject were, canal freight at $4.50 per ton, as to part, and $5 per ton as to another part, railroad freight at $6 per ton, insurance, and Wilkie's commissions. The railroad freight was unquestionably

paid in full, as was the canal freight. The insurance and commissions of Wilkie were therefore the only items as to which deductions could be made; and if any were made from these items, is it credible that they were thrown off by Wilkie for the benefit of Davis without any proof that he disclosed to the plaintiff that he was acting for the defendant as partner, agent or otherwise? There are other facts in the case which are calculated to induce the belief that the partnership between the parties was concealed in order the more successfully to extort illegal charges from the plaintiff.

The defendant's counsel insisted, on the trial, and insisted on the argument of the appeal, that it was proved there was $151 deducted by Wilkie from the charges; that Wilkie so swore positively, and the plaintiff did not deny it. This is a mistake. The plaintiff produced a statement of account of the charges on the iron, which corresponded exactly with the one produced by Wilkie, and he says he arranged for the payment of the bill just as it stands. This cannot be true, and yet the plaintiff have had the deduction claimed by Wilkie. It was for the jury to say which version of the transaction they would believe.

I have examined the other grounds upon which the defendant's counsel relies to reverse the judgment, but I do not regard them of sufficient importance to require discussion. I am therefore of the opinion that the judgment should be affirmed.

Judgment affirmed.

[ONONDAGA GENERAL TERM, June 25, 1867. *Bacon, Foster, Mullin* and *Morgan,* Justices.]