Hatch, J.
We have but little difficulty with the rules of law case, after a careful analysis of the evidence given upon the trial. Defendant, in the performance of its contract, is held to the exercise *355 bi reasonable diligence, must use ordinary forecast in anticipating an obstruction, and due diligence in overcoming it when it arises, and, as soon as the obstruction ceases to operate, it must exercise diligence in the fulfillment of its contract. Bowman v. Teall, 23 Wc..d. 306; Parsons v. Hardy, 14 id. 216; Geismer v. Railway Co., 102 N. Y. 570. A freezing of the canal is such an act of intervention of the vis major as will excuse performance until the obstruction be removed. So, too, the existence of conditions produced without the fault of the carrier, and attributable to accident or misfortune, excuses delay in transportation; and, if such conditions arise as to render further progress so difficult and dangerous that a person exercising ordinary care, prudence, and forecast would deem it unsafe, then the carrier will be exonerated from failure to proceed, and can justify his act in selecting a place of safety and remaining there. But in each of these cases he must justify his delay by proof of conditions which bring him within the projection of the rule invoked, and upon him rests the burden of establishing the sufficiency of his excuse. Read v. Spaulding, 30 N. Y. 642 ; Bostwiclc v. Railroad Co., 45 id. 717.
Upon the application of these rules this case is to be determined. So far as there was delay in obtaining a load for the boats before the 29th of November it may be dismissed, except in so far as it furnished a sufficient excuse, and showed necessity for going upon the dry dock at Lockport. And it may be considered unfortunate, for, had there not been this delay of nine hours, defend- and would doubtless have seen its way clear for proceeding. But the fact cannot be considered as controlling, for defendant chose, notwithstanding the delay, to accept the cargo and enter upon its transportation. It is quite clear that, when the charter was made, both parties contemplated that it might be difficult of performance, and, considering the lateness of the season and the condition of the weather, it was clear to both that ice was likely to be met with, so the bills of lading provided with the respect to the obligations of each should the vessel be frozen in. The parties, therefore, had before them these contingencies, and contracted with respect thereto. This condition imposed upon defendant the obligation of a sturdy attempt to overcome such obstacles and fulfill the contract, and mere difficulty of performance from such cause cannot excuse him, for it was these difficulties that he expected to meet, and was also expected to overcome. Diligence, therefore, as applied to these facts, must be measured by what the parties clearly understood when the contract was made. Notwithstanding the expressed opinion of Capt. McCormick, supported by a large number of witnesses, that he could not have reached the Hudson river within the-time left him after, reaching Rochester before the canal closed, we have reached the conclusion that its accomplishment was not of extreme difficulty, and might have been achieved without extraordinary effort, but by ordinary diligence. It is demonstrated as a fact that the canal was quite easily naviable east of Rochester when defendant tied up its boats, for at that time or shortly thereafter two boats passed by defendant which had come from thts east, while the two boats which followed defendant con *356 tinued on without stopping. These boats, although propelled by horses, found little or no difficulty in making their respective ports. Knapp, who ran the first of these boats, says that, he continued on, found some ice between Eochester and Fairport, a distance of fifteen miles, and was bothered some with it, but after that encountered none that amounted to anything; he was in motion all the time, except to change horses; that on Wednesday morning it began to thaw. McGrraw, .who ran the other boat, states that, he left Eochester, he found no more obstruction than in summer; that there was a little ice for seven or eight miles east, but that it did not obstruct him any. He further states that on Sunday it was cold and stormy, and made ice. On Monday it continued cold. On Tuesday it was warm and the sun shoné. Wednesday was warmer still, and where he was the ice had all disappeared from the canál. He is corroborated by the testimony of his son, who was on the boat.
So far as the fact of navigation is concerned this testimony is without dispute. • Upon the subject of temperature it is contradicted by a large number of witnesses. But in this respect it receives certain corroboration from the weather reports, which must be accepted as the fact. These show that on Sunday, the 29th, it was 10 degrees above zero about daylight at Buffalo, and rose to 20 about two o’clock in the afternoon, dropping to 14 degrees during the night and morning of the 30th, and rising to 34 degrees at eight in the morning. On the 1st of December, at eight in the evening, it was 42 degrees above at Buffalo, 34 degrees at Oswego, and between those two points at Eochester. On the 2d it was 44 at Buffalo and Oswego at eight p. m. The 3d it was 54 degrees at Buffalo, 46 at Oswego, and 42 degrees at Albany. The 5th : Buffalo, 38 degrees; Oswego, 36; Albany, 40 degrees. The 6th : Buffalo, 34 degrees; Albany, 50 degrees. It thus conclusively appears that from eight p. m. of November 30th, up to the 6th day of December the temperature was above freezing, and no ice could form. It is idle to urge the acceptance of recollection of witnesses that ice formed during this period when the certain record shows that such could not be the case. We thus have the fact that, when McCormick tied up his boats at Eochester, the temperature was between 42 and 34 degrees, boats were in fact running both east and west, and that with but slight obstruction. From Eochester to the Hudson river is 252 miles. The rate of speed necessary to have reached the river by midnight of the 5th of December was only 2-J- miles an hour, and when extended until two o’clock of the next day, when the last boat in fact passed out, reduces the rate to 2.19 miles an hour. According to McCormick’s testimony, his running time between Tonawanda and Loelcport, including passing the locks and reaching the dry dock, was 2.1 miles an hour. A slight increase in speed over this rate would have carried him to the river by midmight of the 5th, and by including the extended time at two o’clock of the next day, it did not require so fast a rate. But he made better time between Lock-port and Brockport, as he covered this distance at the rate of 2.2 miles an hour, although he encountered ice all the way, and quite *357 heavy from. Medina, and he assures us that at this time he was running very slow. His actual running time between Tonawanda and Bochester, deducting the delay at Lockport, according to his testimony, was 2.07 miles an hour, although he passed through ice two inches thick the last part of the distance, and reduced his running time to 1.3 miles an hour. He also states that this boat, with this tow, would run nearly a third faster without obstructions than a horse boat, and the latter rates at about two miles an hour; while Hall, who built the boat, that she could “run perhaps a third faster, or it might be fifty per cent, faster.”1' It also appears that a very serious drawback to fast time is delay at the locks. ■ But here , was presented for his tow at all this time a practically free canal, and while much testimony was given about delays on account of ice incumbering locks, it simply clouds the issue, for it is an established fact that, at the outside, fifteen miles east of Bochester no ice remained to obstruct either canal qr locks. A like observation may be made concerning the large volume of testimony respecting ice at Montezuma. The ice there was encountered at the same time it was encountered by McCormick west of Bochester. But this ice melted away, and, had defendant gone on without stop at Bochester, there was no substantial obstacle in his way; and, measuring the distance by ordinary rates of speed and the rate of speed the tow in fact made against obstacles, we can find no reason for holding that defendant could not have made the river by the close of navigation, but can say with much certainty • that he could have reached the last seven mile level by the time the last boat passed through ; and this, by long custom, known to defendant, would have insured his passage into the river. The fact, however, that he could, by the exercise of diligence, have reached the river, does not conclusively establish that he was not justified in remaining at Bochester; for if the conditions which then confronted him were of such a character that an ordinarily careful and prudent person, under the same obligations, would have deemed it unwise, unsafe, and hazardous to proceed, then defendant must be held excused for so determining. The conditions upon which he bases his excuse are these: That the ice has formed heavy and thick west of Bochester, which caused him to greatly reduce his speed, accept assistance from the ice breaker, and raised grave doubt in his mind of his ability to reach Bochester; that his boat was severely cut by the ice already encountered; that he could only run at the risk of sinking, as the oakum had been torn from the seams; that he inquired of the boat running west as to the condition of the canal east, and was informed that it was bad; that he also made inquiry of the division superintendent, and was informed by him that ice had formed east of Bochester, and that it was unsafe for him to proceed ; that he was advised by several persons that it was unsafe to proceed, and that he could not make the river by the time the canal closed ; that he telegraphed the superintendent of canals, and received from him a telegram that canals would close on the 5th of December at midnight, unless sooner closed by the elements. All of these conditions find support in the testimony given by McCormick and *358 by numerous other witnesses, and, the large majority of canal-men called expressed the opinion that stopping at Rochester was the most prudent thing to do, considering all the circumstances. We are now to see whether this claim can be sustained in the light of what certain established facts show.
We have already seen that due diligence would have accomplished the performance of the contract. Ought he to have exercised it? It appeared upon the trial that the most difficult place in the canal for ice obstruction was immediately west of Rochester. This was due to the "large body of still water through which it ran. This McCormick knew, and consequently knew that, when be reached Rochester, he had passed his most perilous point, so far as heavy ice was concerned. Had the temperature remained the same as on Sunday and Monday, but little doubt would remain but that it was wise to stop. But the temperature had risen, and, at the time he tied up the boats, it stood at Rochester between forty-two and thirty-four degrees. At this time there had been sent by the weather bureau a forecast of the weather, which stated that it would continue fair, with warm southerly winds, and this was published in the public journals. This condition of the temperature must lead to a rejection of McCormick’s statement and that of other witnesses that ice formed very fast Tuesday night, for we know that ice could not form in a temperature above thirty-four degrees. McCormick made no effort to'find out what the condition of the canal was east prior to the time he tied up. He simply acted upon the determination, which he said he already formed before he reached Rochester, of stopping there. After he had stopped, he made an inquiry of the boat which came from the east, and was informed that conditions were bad. This undoubtedly was true in a measure, for it was a late and bad time of year. But he knew from this circumstance that this boat had made a channel, and the temperature was such that no ice could form and that he could go ahead. He concluded, however, to wait, remained on his boat, and prosecuted no further inquiries to determine what he ought to do. The next morning he learned from the papers that it would be warmer, telegraphed the superintendent of the canals asking when the canal would close, and made an inquiry of the division superintendent about the canal east. This superintendent’s division was Ho. 9, extending twenty miles west of Rochester; consequently as to that portion of the canal McCormick knew as much as he. But it did appear that he lived at Rairport, and had come up from there on this morning, and here-ported the canal then was frozen over. In this respect his testimony is at variance with the weather report, the state of the temperature at this time, and the testimony of McGfraw. There were other sources of information open to McCormick which should readily have suggested themselves. He knew at this time that Knapp and McGraw had gone forward ; that, prior to their going, boats-had come from the east; and that there must be a channel open. There were several towns and telegraph stations along the route. This admitted of communication with them, and would have opened up information that they were proceeding with but *359 little, if any, trouble, or communication with lock tenders or superintendent’s of the respective divisions would have produced like results. He knew that the weather report predicted warm weather ; that it was then quite warm for that time of year; and that what ice existed was melting. His obligation commanded him to move forward as soon as the obstruction ceased to operate. This he did not do, and consequently failed in a plain duty. It is stated that his boat was badly cut by ice, and that it was dangerous for him to go forward. There is much conflict in the- evidence respecting how badly the boat was cut. His fo'rward boat was not cut at all. The steamer was cut, according to McCormick and other witnesses, from two to two and a-half inches in depth > by others, less. - That she was cut sufficiently to cause some apprehension is clear, and had the weather continued cold, and ice formed, could be here pleaded as an excuse. Neither of the boats was leaking, and it had not been found necessary to repair the steamer on account of the cutting up to the time of this trial. Due diligence upon the part of McCormick, coupled with the fact that he had already passed the worst portion, would have informed him that there existed no ice, either thick or thin, to further damage the boat.
It is suggested that at Rochester was a good bottom, and an elevator where the cargo could be unloaded to the best advantage. But the same thing is true of several other places east. It does.not furnishing a controlling or mitigating circumstance in view of the other conditions. If we could see that it was proper for defendant to stop on Tuesday night, the conditions existing at an early hour of Wednesday morning showed necessity for further progress in the fulfillment of the contract, and he then had time for performance. McCormick could have known, by the exercise of diligence, the actual condition of the canal not later than ten o’clock of Wednesday. He then had left eighty-six hours to reach the river at midnight of the 5th. This would have made a running time of 2.86 miles an hour. By adding fourteen hours, the time when the last boat passed through, it would have reduced hia time to 2.52 miles an hour. Either of these rates of speed was clearly within the capacity of the boat, upon defendant’s showing. Starting at this time, he had before him a free canal, and could proceed without any delay at locks ; and, according to the custom of the canal, in entering upon the last level the boat would be let out, still further adding to the certainty of getting through. We are therefore convinced that defendant has not made a case showing the use of that diligence which it contracted to exercise, and is therefore liable for the damages sustained. The damage is measured by the difference in the contract price and increased cost of transportation in order to procure the delivery of the property at its destination, Ogden v. Marshall, 8 N. Y. 340; Briggs v. Railroad Co., 28 Barb. 515; 3 Suth. Dam. 213, and for such further increased expense as was necessarily incurred as a consequence of the delay. Farwel v. Davis, 66 Barb. 73 ; 3 Suth. Dam. 226. It also became the right of plaintiffs, under these circumstances, to *360 retake possession of the grain, and forward the same to its destination. Laurent v. Vaughn, 30 Vt. 90.
As the fulfillment of the con tract determined the right of defendant to demand freight money, so its negligence in delaying the prosecution of the voyage defeated its right thereto, in consequence of which it had no right to demand, as a condition of delivery of the grain, pro rata freight money for the distance carried. Plaintiffs having been compelled to pay as a condition of recovering possession of their property, are entitled to recover it back, as money paid under compulsion. Scholey v. Mumford, 60 N. Y. 501; Harmony v. Bingham, 32 id. 99. Judgment is therefore ordered in favor of plaintiffs, in accordance with this opinion.
Judgment for plaintiffs.