NATHANIEL T. KIRBY, Appellee, *vs.* THE CHICAGO AND
ALTON RAILROAD COMPANY, Appellant.

*Opinion filed December 22, 1909.*

1. CARRIERS—*when way-bill is to be regarded as part of con-tract of carriage.* In determining whether a special contract was made between a shipper and carrier to deliver a car-load of valuable horses to a connecting carrier on a certain day so that it would be attached to the "Horse Special" on such connecting carrier's road, which was run three days a week, the way-bill exhibited by the carrier's billing clerk to the shipper, bearing the notation, "In care of fast horse train out of Chicago on M. C. Ry. about 3 P. M. Thursday, January 25, 1906," must be regarded as part of the contract.

2. SAME—*when question of a shipper's assent to limitation of liability in contract is one of fact.* Where there is evidence tending to show a special contract between a shipper and carrier for the transportation of a car-load of valuable horses, the question whether the shipper, who signed the contract without reading it, because, as he testified, he knew the carrier would not take the horses if he did not sign, assented to conditions in the contract limiting the carrier's common law liability, is one of fact, to be finally determined by the Appellate Court in an action at law for damages for breach of the contract.

3. SAME—*what agreement does not violate Inter-State Commerce act.* A carrier does not violate the Inter-State Commerce act by agreeing with a shipper of horses to deliver the horses at a certain station, to connect with a specified fast train which is to take them to their destination, particularly where the evidence tends to show that other carriers were ready to accord the same service to the shipper at the same rate, and there is nothing to show that any other shipper would not have been accorded the same privilege upon request.

4. SAME—*a shipper not bound to cipher out complicated tariff.* Under any reasonable view of the Inter-State Commerce act it is not necessary to the protection of the rights of a shipper that he cipher out, before putting his property into commerce, the confusing figures of the tariff sheets, in order to ascertain whether or not his shipping contract violates the said act.

5. SAME—*right of shipper to recover damages though contract violates Inter-State Commerce act.* Where a shipper enters into a contract of carriage in good faith and without actual knowledge that he is being given special privileges at the ordinary tariff rate,

even though such contract were construed to be in violation of the Inter-State Commerce act and the carrier be entitled to recover the proper rate, the rights of the shipper are not, in other respects, different from what they would have been had the contract been free from such alleged illegality.

6. SAME—*what amounts to ratification of an agent's contract.* Where a live stock agent having authority to offer "better service and quicker connections" secures a shipment of valuable horses for his company by agreeing to deliver them to a connecting carrier so that they will go through to their destination on a certain fast train, the acts of the company's freight agent in fixing the rate, of its billing department in billing the car and of its operating department in forwarding the car in accordance with such agreement, amount to a ratification of the agent's agreement.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

PATTON & PATTON, (F. S. WINSTON, and SILAS H. STRAWN, of counsel,) for appellant:

Statements made by a live stock agent with reference to speed of service or connections do not constitute an express contract binding the carrier. *Railroad Co.* v. *Wentworth,* 27 S. W. Rep. 680, and 28 id. 277.

An agent having mere authority to solicit business can not bind his employer by a contract different from that advertised by the principal. *Leinkauf* v. *Lombard,* 42 N. Y. Supp. 391; *Elder* v. *Stuart,* 85 Iowa, 690; *Harris* v. *Railroad Co.* 91 Ga. 317; *Angle* v. *Railroad Co.* 18 Iowa, 555; *Elkins* v. *Railroad Co.* 3 Fost. 275; *Crouch* v. *Railroad Co.* 42 Mo. App. 248.

An agent of a railway company employed for the purpose of soliciting passenger business, and who is not held out by the company for any other purpose, has no power to bind the company by a contract. *Taylor* v. *Railroad Co.* 74 Ill. 86; *Voorhees* v. *Railroad Co.* 71 Iowa, 735.

The authority of an agent is never extended, by implication, to acts prohibited by law, so as to render his innocent principal liable in a criminal action. *Clark* v. *Bank,* 3 Duer, 241; *Stover* v. *Flower,* 120 Iowa, 514.

One dealing with a special agent should ascertain the extent of his authority. *Bank* v. *N. & S. Co.* 223 Ill. 41.

The contract set out in the declaration being for a special service not noted in, but, on the contrary, prohibited by, the published tariffs, even if made, was void, as being in violation of the sections of the Inter-State Commerce act prohibiting discrimination, and no recovery can be had thereon. The effect of the violation of the Inter-State Commerce act is to make the contract of carriage, including the rate named therein, invalid. *Inter-State Commerce Com.* v. *Railway Co.* 128 Fed. Rep. 59; *Church* v. *Railroad Co.* 14 S. Dak. 443; *Railway Co.* v. *Mugg,* 202 U. S. 242.

If the rate is duly published and thus called to the attention of shippers and consignees, they cannot depend for the lawful rate or charge on what may be quoted by the carrier's agent but must be guided by the published rate sheets themselves. *Suffern* v. *Railroad Co.* 7 Int. Com. Com. Rep. 185; *Railway Co.* v. *Harrison,* 119 Ala. 539; *Kinnavey* v. *Terminal Ass.* 81 Fed. Rep. 802; *Railroad Co.* v. *Hamburger,* 155 id. 849.

All privileges accorded on shipments in transit, and which affect the value of the services performed, must be published in the tariffs, and reparation based on a breach of contract for a privilege which was not mentioned in the tariffs must be denied the shipper, because its allowance without publication was in violation of law. Elliott on Railroads, (2d ed.) sec. 1684; *Shiel* v. *Railroad Co.* 12 Int. Com. Com. Rep. 211; *Match Co.* v. *Railroad Co.* 9 id. 311; *St. Louis H. & G. Co.* v. *Railroad Co.* 11 id. 90; *In re Rates and Practices of M. & O. Railroad Co.* 9 id. 373; *In re Rates on Cotton,* 8 id. 121; *Commercial Club* v. *Railroad Co.* 13 id. 288; *Fuel Co.* v. *Railroad Co.* 14 id. 119.

When a State statute in regard to inter-State commerce conflicts with a Federal statute, the State statute must give way. *Railroad Co.* v. *Hefley,* 158 U. S. 98.

Where a suit is brought on an illegal contract the defendant may set up the illegality as a complete defense to the suit. *Smythe* v. *Evans,* 209 Ill. 376; 15 Am. & Eng. Ency. of Law, (2d ed.) 1013; 9 Cyc. 546.

ALBERT SALZENSTEIN, and GRAHAM & GRAHAM, for appellee:

Where carriers transact their business through agents, either general or local, it is competent for such agents to bind them by such contracts as the public have a right to suppose they are authorized to make from the manner in which they are employed or seemingly entrusted by their principals. 2 Hutchinson on Carriers, (3d ed.) secs. 460, 462; 5 Am. & Eng. Ency. of Law, (2d ed.) 351, 352; *Railway Co.* v. *Elliott,* 76 Ill. 67; *Doan* v. *Duncan,* 17 id. 272; *Insurance Co.* v. *Farrish,* 73 id. 166; *Nash* v. *Classen,* 163 id. 409; *Rudell* v. *Transit Co.* 117 Mich. 568; *Stoner* v. *Railroad Co.* 109 Iowa, 554.

The question whether an agency exists, and if so, the extent of the agent's authority, is one of fact for the jury, and the extent may be inferred by the jury from the apparent authority. *Railway Co.* v. *Milk Co.* 175 Ill. 557; *Munn* v. *Burch,* 25 id. 35; *Hankins* v. *Lombard,* 25 id. 572; *Insurance Co.* v. *Ward,* 90 id. 545; *Insurance Co.* v. *Stock,* 149 id. 319; *Nash* v. *Classen,* 163 id. 409; *Insurance Co.* v. *Schallman,* 188 id. 213; *Insurance Co.* v. *Stoddard,* 197 id. 330.

Where an agent exceeds his authority there need not be an express ratification, but it may be inferred from circumstances. *Fraternal Army* v. *Evans,* 215 Ill. 629; *Searing* v. *Butler,* 69 id. 575.

The decision of the Appellate Court affirming the verdict of a jury finding, in effect, that an agent did not exceed

his authority or that his act has been ratified, is final and cannot be reviewed in the Supreme Court. *Smith* v. *Treat,* 234 Ill. 552.

Whether a shipper assented to the limitation of the carrier's liability is a question of fact. *Railroad Co.* v. *Thomas,* 222 Ill. 337.

Such question of fact is settled by the decision of the Appellate Court. *Railway Co.* v. *Milk Co.* 175 Ill. 557.

A common carrier is an insurer for the safe delivery of live stock, and as such is answerable, in the absence of a special contract to the contrary, for every loss that cannot be attributed to God, public enemies or the vices of the animals themselves. *Railway Co.* v. *Hamilton,* 76 Ill. 393; *Railroad Co.* v. *Thomas,* 222 id. 337; *Railroad Co.* v. *Simon,* 160 id. 648.

No receipt, bill of lading or contract prepared by the carrier, even though signed by the shipper, is effective to waive any of the common law or statutory obligations of the common carrier, unless the shipper has actual knowledge of the contents of the instrument and assents thereto. *Railway Co.* v. *Thomas,* 222 Ill. 337; *Railway Co.* v. *Patton,* 203 id. 376.

A common carrier cannot, in this State, limit its liability, in amount or otherwise, even by express contract, for a failure on its part or that of its servants to exercise ordinary care in the transaction of its business. *Railway Co.* v. *Chapman,* 133 Ill. 96; *Railway Co.* v. *Stock Farm,* 194 id. 9; *Boscowitz* v. *Express Co.* 93 id. 523; *Railway Co.* v. *Wilcox,* 84 id. 239; *Adams* v. *Stettaner,* 61 id. 184.

There is nothing in the Inter-State Commerce act which prevents the law of the State where the contract is made or injury is done from having full force and effect, even though in doing so the result be to nullify the limitation contained in the published schedule of rates and uniform live stock contract, and give the shipper larger damages than he could have obtained had he been bound by them. *Rail-*

*road Co.* v. *Hughes,* 191 U. S. 477; *Railroad Co.* v. *Solan,* 169 U. S. 133.

The fact that a contract between the shipper and carrier violates the Inter-State Commerce act does not prevent or affect the shipper's right to recover for injuries or damages occasioned by the negligence of the carrier in the shipment. *Insurance Co.* v. *Carriers Co.* 91 Tenn. 538; *Storage Co.* v. *Insurance Co.* 151 U. S. 373.

Per CURIAM: This is an appeal by the Chicago and Alton Railroad Company from a judgment of the Appellate Court for the Third District affirming a judgment for the sum of $4200 recovered by Nathaniel T. Kirby, the appellee, against the appellant, in the circuit court of Sangamon county, in an action of assumpsit to recover damages for the breach of an alleged special contract entered into by appellant with appellee, whereby appellant was obligated to transport a car-load of horses from Springfield, Illinois, to Joliet, Illinois, and to secure transportation for the car from that point to New York City over the lines of the Michigan Central Railroad Company.

The declaration, in one count, alleged, in substance, that on January 24, 1906, appellant, in consideration that appellee would ship a certain car-load of high-bred trotting horses over its road which he was intending to ship to New York City during that month to be sold at a sale of high-bred trotting and pacing horses at Madison Square Garden, promised appellee that said stock should be carried by it over its lines to Joliet, Illinois, and then over the lines of the Michigan Central Railroad Company by a fast stock train, known as the "Horse Special," to New York City, for the sum of $170.60; that appellee, relying on said promises, on January 24, 1906, paid the said sum and delivered to appellant, for transportation, the said car-load of horses, and that it was received by appellant under the terms and

agreements aforesaid, and that it thereby became the duty of appellant to carry said car-load of horses in accordance with the terms of said agreement, but that, wholly disregarding its duty in that behalf, appellant did not deliver said car-load of horses to the Michigan Central Railroad Company so that they could be carried on the Horse Special to New York City, but neglected and failed so to do, and by reason of such neglect and failure appellee was obliged to have them carried by a later train and by inferior and slower means of transportation, whereby said stock was delayed in transit more than forty-eight hours and reached the destination too late to be put in proper shape for exhibition and sale at said horse sale, and that by reason of such delay and inferior transportation all of said horses were damaged and depreciated in value and several of them became sick, etc.

Appellant interposed the general issue. A trial by jury was had, resulting in a verdict in favor of appellee for the amount of the judgment hereinbefore mentioned. . At the close of all the evidence the motion of appellant for a peremptory instruction was denied.

The appellee was engaged in the business of developing horses for racing and carriage purposes in the city of Springfield, Illinois. Early in January of 1906 he decided to ship fourteen head of high-bred horses, ranging in value from $200 to $3500, to New York City, to be sold at a horse sale at Madison Square Garden, in that city, the latter part of that month. Upon learning of appellee's plans he was solicited by Mr. Connor, the ticket agent for the appellant at Springfield, to ship over appellant's road. Connor suggested to appellee that he would have W. P. Eggleston, the freight agent of appellant in that city, confer with him about rates, etc. Appellee objected to dealing with Eggleston, and Connor then proposed to send R. W. Stuttsman, appellant's live stock agent, to see him. Shortly thereafter Stuttsman called on appellee for the purpose of

securing the business, and at that time appellee told Stuttsman that he had a lot of high-priced horses that he wanted to ship to New York by the fastest available trains; that he desired the shipment to go by way of Joliet in order to make connections at Lake with the Horse Special on the Michigan Central railroad, which left Chicago for New York on three days in each week. Stuttsman was unable to quote the rate on the car from Springfield to New York, and he, together with appellee, went to the office of Eggleston, who also at that time was unable to give the rate. In a day or two, however, Eggleston, upon the third application to him, telephoned appellee that the rate would be $170.60, and appellee, with the understanding that connections would be made at Lake with the Horse Special, then directed Eggleston to order the car for January 24. A few days later Stuttsman informed appellee that he was shipping just at the right time, as the Horse Special left Chicago on Tuesday, Thursday and Saturday of each week, and that he would reach Joliet in time over appellant's line to make proper connection; that appellant would attend to having a transfer of the car made and guarantee to put him on the Horse Special.

On January 24, 1906, appellee was furnished with an Arms Palace Horse Car, in which his horses were loaded during the afternoon. When he went to the freight office to get his shipping contract, shortly before the train containing his car left for Joliet, neither Eggleston nor Stuttsman was there. A bill clerk of appellant, named Byers, was then in the office. Byers told appellee that the contract was already prepared and ready for his signature, and passed a document partly through the wire grating for appellee to sign, and he, without reading, signed. In response to appellee's inquiry if all arrangements had been made at Joliet, Byers replied that the matter had been attended to, and exhibited the way-bill indicating that the horses were to be carried on the Horse Special. The document signed

by appellee contained provisions limiting the common law liability of appellant. The amount charged appellee by appellant was the regular tariff rate of sixty-five cents per hundred on a minimum of 20,000 pounds for horses shipped under the conditions of the so-called "uniform bill of lading" and the rental of the Arms car.

Appellee accompanied the shipment and the car reached Joliet on the morning after it left Springfield. Upon its arrival there it was switched to the tracks of the Michigan Central railroad, where it remained until about six o'clock that evening, when it was taken from there to Lake by the employees of the latter company too late for the Horse Special, but about midnight it was attached to a meat and provision train on that road and carried to New York. This train ran on a much slower schedule than the Horse Special, and arrived in New York City on January 29, thirty-six hours or more later than the Horse Special to which appellee expected his car to be attached at Lake. The car reached Joliet and was switched into the Michigan Central yards in time to have been taken by the latter company to Lake, where it could have been attached to the Horse Special if proper arrangements had been made by appellant with the Michigan Central company to have the car attached to that train, but no such arrangements had been made, and appellee, after he reached Joliet, was unable to effect the connection.

Appellee had arranged to have the horses sold at a great public auction at Madison Square Garden on the 30th, and when the car reached New York City the day before, a number of the horses were ill, and on account of the delay in transit he was unable to properly prepare and exhibit his horses before they were offered for sale, and when sold some of them were still sick, and they were otherwise in such condition, consequent upon the delay, that their value was materially lessened.

It is contended by appellant that the court erred in denying its motion to direct a verdict.

It is first contended by appellant that the motion for a directed verdict should have been allowed for the reason that "there was no evidence fairly tending to prove a contract for the Joliet connection with the Horse Special made by an agent having authority to make such contract." The evidence most favorable to appellee shows that he made a contract with Stuttsman, the live stock agent of appellant, by which the car containing his horses was to be taken to Joliet and transferred to the Michigan Central and to be by that road taken from Lake to New York City on the Horse Special, provided the rate was satisfactory. Stuttsman and Kirby then called on Eggleston, the freight agent of appellant, to ascertain what the rate would be. Eggleston stated that he was not able to quote the rate at that time but would get it. Upon the third application made by Kirby, Eggleston quoted the ordinary rate to New York City and Kirby accepted. Kirby went to sign the contract on the day on which he shipped his horses. At the time he signed the instrument which Byers, the bill clerk, presented to him for signature, he asked whether the necessary arrangements had been made at Joliet. The clerk answered in the affirmative and exhibited the way-bill showing that the car was to be taken by appellant to Joliet and showing the consignees to be "Pasig, Tipton & Co.," New York City, N. Y. On the face of the bill appeared these words: "In care of fast horse train out of Chicago on M. C. Ry. about 3 P. M. Thursday, January 25, 1906." Kirby then signed the document. We think, under the circumstances, the way-bill should be regarded as a part of the contract, and it, with the other proof just referred to, clearly shows that the contract was made as Kirby contends.

It is insisted, however, that neither Stuttsman, Eggleston nor Byers had any authority from appellant to make a contract by which the appellant was obligated to secure

the shipment of these horses by the Horse Special over the Michigan Central lines. Stuttsman testified that it was his business to induce shippers to send their live stock over the lines of appellant but that he could offer no reduced rate; that what he did offer "was better service and quicker connections." It was an offer of this character which induced Kirby to make the contract, as he had already been offered precisely the same rate by other carriers. After having made the arrangement with Stuttsman for "better service and quicker connections," the freight agent fixed the rate, the billing department billed the car, and the operating department of appellant started the car on its journey in accordance with the contract originally made with Stuttsman. If it can be said that Stuttsman did not have the authority to make this contract, and if it can be said,—which we very much doubt,—that appellant did not hold him out as having such authority, we still think it entirely clear that appellant ratified Stuttsman's act in entering into the contract by billing the car and moving it to Joliet pursuant to the terms of that agreement.

The instrument signed by Kirby contained a number of provisions limiting the common law liability of the appellant in such manner that no recovery could be had in this case if appellee was bound by those provisions. The evidence shows that the instrument, already prepared, was presented to Kirby by the bill clerk and Kirby was directed to "sign there;" that he signed without reading the contract and without knowledge of its contents, because, as he says, he knew the company would not take his horses if he did not sign. Irrespective of this document there was evidence, as above indicated, showing that appellant was bound to transport these horses and have the car put in the Horse Special on the Michigan Central lines. Whether appellee knowingly assented to the provisions contained in the written instrument which he signed, whereby the common law liability of appellant was limited, was upon this record a

question of fact to be finally determined by the Appellate Court. *Chicago and Northwestern Railway Co.* v. *Calumet Stock Farm,* 194 Ill. 9; *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Patton,* 203 id. 376; *Wabash Railroad Co.* v. *Thomas,* 222 id. 337.

It is next contended that the contract upon which recovery was had was for a special service not provided for by the published tariffs of appellant, and if made was void for the reason that it was in violation of the Inter-State Commerce act, prohibiting discrimination among shippers. The basis of this contention is found in the fact that the contract as counted upon was to ship by a certain train over the Michigan Central lines, not under conditions of the "uniform bill of lading," while the rate was the ordinary rate for the shipment of horses from Springfield to New York under conditions of that bill of lading and by such trains as the carriers might select. The theory is, that the agreement to ship by the Horse Special was a discrimination in favor of Kirby. The Inter-State Commerce act (3 Comp. Stat. U. S. p. 3155,) requires a carrier to charge the same sum against each shipper where "a like and contemporaneous service" is rendered to each, and makes a discrimination as to rates unlawful. It also provides for the making and publishing of schedules of rates, which shall contain a classification of freight and any rules and regulations which in anywise change, affect or determine any part or the aggregate of the rates. By the amendatory act of February 19, 1903, (U. S. Comp. Stat. Supp. of 1903, p. 363,) it is provided: "It shall be unlawful for any person, persons or corporation to offer, grant or give, or to solicit, accept or receive any rebate, concession, or discrimination in respect of the transportation of any property in inter-State or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto, whereby any such property shall by any device whatever be transported at a less rate than that named in

the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced." It is the provision just quoted which it is contended inhibited the making of a contract by which the horses were to go on any particular train.

The further contention as to the illegality of the contract is this: The rate paid was that fixed by the schedules for property shipped subject to what is termed "uniform bill of lading conditions," and the schedules provided that if property be shipped not subject to those conditions the rate shall be higher, and fixes the amount of the increase. If the property was shipped pursuant to the contract counted upon, and appellee was not bound by the provisions of the written instrument signed by him purporting to limit the common law liability of appellant, then it was not shipped subject to "uniform bill of lading conditions." It appears that the appellant has complied with the provisions of the act just referred to, with reference to filing and publishing joint tariff rates. These rates could be ascertained at the Springfield freight office of appellant by consulting, first, a printed volume containing one hundred and thirty-two pages, known as the "Official classification;" second, a printed pamphlet of eleven pages, known as "Joint through freight tariff;" and third, another document known as "List of stations taking percentage rate bases." While the Horse Special was operated for the express purpose of carrying animals designed for the eastern markets and ran but three times a week, there is nothing in these schedules from which it can be ascertained under what condition the shipper may have his stock carried by that train or from which it may be ascertained that the rate for such service as is rendered by that train would be other than the rate paid by appellee. It follows, if appellant's contention be correct, that while it has a traffic arrangement with the Michigan Central road by which horses shipped in car-load

lots over its lines may be carried by the Michigan Central road to New York; no method has been provided whereby the shipper may be certain that he will have his horses carried by that train on the Michigan Central lines, which is specially designed to render the precise service the shipper desires.

In the case at bar we think it clear that the railroad company had a right to agree to connect with the Horse Special, and in doing so it did not agree to perform such a special service as to in any way violate the Inter-State Commerce act. The agreement to carry appellee's horses from Joliet to New York on the Horse Special was a legitimate means of procuring business, and there is nothing in the record to show that every other shipper was not entitled to the same privilege and would have been accorded it upon request. Moreover, the evidence tends to show affirmatively that other railroads were ready to accord the same special service to appellee at the quoted and contract rates agreed upon between him and appellant. The Supreme Court of the United States, in *Texas and Pacific Railway Co.* v. *Inter-State Commerce Commission,* 162 U. S. 197, held that all preferences and advantages are not prohibited by the Inter-State Commerce act, and quoted with approval the rule announced by Justice Jackson in the case of *Inter-State Commerce Commission* v. *Baltimore and Ohio Railroad Co.* 43 Fed. Rep. 37, (which was affirmed in 145 U. S. 263,) as follows: "Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or advantage or subject to undue prejudice or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to

manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits." See, also, *Southern Pacific Railway Co.* v. *Inter-State Commerce Commission,* 200 U. S. 536.

We are unable to see that there is anything in the agreement to ship by Joliet so as to connect with the Horse Special violative of the provisions of the Inter-State Commerce act, as interpreted by the Federal courts.

Passing that question, however, appellant's position is that, the contract being void, appellee is without right to recover anything on account of its violation, and it is urged in this connection that appellee is conclusively presumed to have notice of the provisions of the Inter-State Commerce act, and to know, not only that he contracted for a lower rate than that which he was entitled to, but also that he contracted for a special service in shipment by a designated train to which he was not entitled and for which appellant could not contract without violation of the act last referred to. Whatever the presumption may be, it is certain from the evidence that appellee did not actually know either that he was obtaining a rate that was unlawful because it was too low, or that he was contracting for a special privilege which he could not lawfully obtain. It is also certain that the schedules showing the rates are so complicated and the rates fixed are so hedged about with conditions and subject to such exceptions that no man not entirely familiar with such schedules could within any reasonable length of time ascertain from them so simple a thing as the rate per carload lot for the shipment of horses from Springfield, Illinois, to New York City. The freight agent of appellant, although he had these schedules at hand, was unable to give the desired information until the third application was made to him. Schedules so prepared are of little real value to the ordinary shipper. Practically, they leave him at the mercy of the agent of the carrier. It has been frequently held in other jurisdictions that the contract for an inter-

State shipment is void as to the rate, under the provisions
of the Inter-State Commerce act, if the rate fixed is less than
the rate charged other shippers for a like and contemporane-
ous service, and that even where the carrier has contracted
for the lower rate, it may collect the rate fixed by its sched-
ules filed and published pursuant to the provisions of the
law.    In *Illinois Central Railroad Co. v. Seitz,* 214 Ill. 350,
however, we expressed a view somewhat inconsistent with
that holding in reference to the right of a shipper to whom
a rate had been made for an intra-State shipment which it
was contended was lower than should have been made to
him under the provisions of our own statute designed to
prevent extortion and unjust discrimination by carriers.
Whether a shipper who makes a contract for an inter-State
shipment at a rate that is discriminatory or which provides
for a privilege not ordinarily given may recover for a fail-
ure of the carrier to comply with its contract to safely
carry, where he was without knowledge of the unlawful
feature of the contract, is a question not determined by the
holdings in other jurisdictions just noticed.    It seems clear
to us that the shipper entered into this contract in good
faith and without actual knowledge of its claimed unlaw-
ful character, and even if the contract were construed to
be void as to the rate fixed, and even if the company may
be permitted to collect the proper rate, still the rights of
the shipper under the contract are not in other respects
different from what they would have been if the contract
had been free from the illegality mentioned.    This view
finds support in the case of *Merchants' Cotton Press and
Storage Co. v. Insurance Co. of North America,* 151 U. S.
368.    There it was charged that special rates, rebates or
drawbacks had been allowed and that the contract was for
that reason void in every respect.    The court held that the
Inter-State Commerce act made the agreement as to the
special rates, rebates or drawbacks void but did not other-
wise invalidate the contract of affreightment.    And in the

242—28

late case of *Standard Oil Co.* v. *United States,* 164 Fed. Rep. 376, the United States Circuit Court of Appeals held that the ordinary shipper, under any reasonable view of the Inter-State Commerce act, was not bound to cipher out, before he could safely put his property into commerce, all the confusing papers and figures that generally make up the tariff sheet. That case was, it is true, a criminal case, but we see no reason why the rule there announced should not apply in a case like this.

We do not regard the cases relied upon by appellant as in point.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*