George A. Fuller et al., Defendants in Error, v. Lake Shore & Michigan Southern Railway Company, Plaintiff in Error.

### Gen. No. 15,799.

1. CONTRACTS—*by what law governed.* Contracts are to be governed by the laws of the state in which they are executed.

2. COMMON CARRIERS—*when contract of shipment not executed.* A contract of shipment entered into in the State of Ohio is not so executed as to effect limitations of liability if it was not "fairly made and understood". *Held,* in this case, that the evidence showed that the agent of the carrier did not do his duty at the time of causing the signing of the contract by the shipper and that the common law obligations of the carrier should be enforced.

Error to the Municipal Court of Chicago; the Hon. EDWIN K. WALKER, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed November 2, 1911.

GLENNON, CARY, WALKER & HOWE, for plaintiff in error.

GEORGE M. MORGAN and J. I. JARRETT, for defendants in error.

MR. JUSTICE SMITH delivered the opinion of the court.

This is a writ of error to the Municipal Court of Chicago to reverse a judgment there entered against the plaintiff in error for the sum of $1,000.

George A. Fuller, one of the plaintiffs, was attending, with race horses, a racing meet at Rockport, about one mile from West Park station, Ohio, on the defendant's road. Mr. Fuller notified the agent at West Park that he wanted a car the next forenoon to ship two horses to Carrollton, Illinois. The agent replied that he would have the car about eleven o'clock. The next day the car was received and loaded by Mr. Fuller with the two horses. The plaintiff, Fuller, paid the freight demanded and signed what is termed a "Limited Liability Live Stock Contract." The train crew in switching the car onto the train made what is known as a "flying switch" and the car, going at the speed of ten or twelve miles an hour, struck the train with such force that it threw the men and horses in the car to the floor; in the language of one of the witnesses, "It just looked like an earthquake had struck us,—horses and men both down, all piled in a heap." The horse Bud Green was so seriously injured that he was worthless; and for the damages to this horse plaintiffs brought this suit.

The proof showed beyond a question that the value of the horse was from one thousand to fifteen hundred dollars; also that the defendant was guilty of gross negligence; in fact the natural and probable consequences of the defendant's conduct was so dangerous to the life and limb of the occupants of the car that it might fairly be characterized as wilful and wanton negligence.

The defense is based upon the proposition that the plaintiffs entered into a contract, introduced in evi-

dence and known as the Limited Liability Live Stock Contract, in part as follows:

"The same has been received, by said carrier for itself and on behalf of connecting carriers, for transportation, subject to the official tariffs, classifications and rules of said Company, and upon the following terms and conditions, which are admitted and accepted by the said shipper as just and reasonable, viz:

"That said shipper, or the consignee, is to pay the freight thereon to the said carrier at the rate of 60 cents per cwt. from West Park, Ohio, to Carrollton, Illinois, which is the lower published tariff rate, based upon the express condition that the carrier assumes liability on the said live stock to the extent only of the following agreed valuation, upon which valuation is based the. rate charged for the transportation of the said animals, and beyond which valuation neither the said carrier nor any connecting carrier shall be liable in any event, whether the loss or damage occur through the negligence of the said carrier or connecting carriers, or their employes or otherwise.

"If horses or mules—not exceeding one hundred dollars each."

   ※       ※       ※       ※       ※       ※       ※

"That no claim for damages which may accrue to the said shipper under the contract shall be allowed or paid by the said carrier or sued for in any court by the said shipper unless a claim for such loss or damage shall be made in writing, verified by the affidavit of said shipper or his agent, and delivered to the agent of the said carrier at his office within five days from the time said stock is removed from said car or cars; and that if any loss or damage occurs upon the line of a connecting carrier, then such carrier shall not be liable unless a claim shall be made in like manner, and delivered in like time to some proper officer or agent of the carrier on whose line the loss or injury occurred."

The defendant also introduced in evidence a Joint Freight Tariff Schedule of 34 pages and Official Classification No. 30, a book of 164 pages in very fine print,

both certified to by the Secretary of the Interstate Commerce Commission, copies of which were on file at West Park station. The said Official Classification No. 30 contained the form of the said Live Stock Contract providing for a limited liability for horses shipped thereunder of one hundred dollars; also instructions and directions so numerous that to understand same requires rather long and patient study by one not an expert. A portion of the same as abstracted is as follows:

"Agents will be expected to thoroughly familiarize themselves with the following, and will take particular care to acquaint consignors, or their agents, with the requirements of the Company before accepting Live Stock for Shipment."

\*     \*     \*     \*     \*     \*     \*

"Agents will be very careful to explain the following requirements to shippers, viz:

"Race Horses, Stallions and other high-priced animals, when consignors are unwilling to have the same transported at the above list of values, will be taken only by special arrangement at one and one-half first-class rates, calculated at the estimated weights named below, but Agents must not accept such valuable animals without first communicating with the General or Division Freight Agent."

The defendant further introduced in evidence the decisions of the Supreme Court of Ohio: Baltimore & Ohio R. R. Co. v. Hubbard, 72 Ohio St. 302, (74 N. E. 214); and Pennsylvania Co. v. Shearer, 75 Ohio St. 249, (79 N. E. 431), for the purpose, as we understand it, to prove that under the Ohio law a common carrier has the right by contract with the shipper to limit the amount of its liability for loss or damage in consideration of a reduced rate of transportation; and also where the terms of the contract provide that the right of recovery by suit is conditioned on notice to the carrier in writing, verified by affidavit, within a certain specified time, is a condition precedent to the right of recovery, if under all the facts and cir-

cumstances of the case the same is held a reasonable provision.

The said contract, if held to have been executed by the plaintiffs, having been entered into in Ohio, is governed by the laws of that state. Christiansen v. Graver Tank Works, 223 Ill. 142; Coats v. C., R. I. & P. Ry. Co., 239 Ill. 154. We are of the opinion that the Ohio decisions introduced in evidence sustain the defendant's contention that the said provisions of the contract in evidence are lawful. It therefore follows that if the plaintiffs executed said contract, a recovery is limited to $100; and if the condition providing for notice be held not to have been complied with under all the circumstances of the case, then there could be no recovery.

Counsel for plaintiff in error say that the contract being held valid under the laws of Ohio, "only two questions are presented in the case at bar; first, was such a contract duly executed? And, second, were its provisions complied with?" If the first question be answered in the negative, the second question is thereby eliminated from consideration.

The evidence pertinent to the signing of the contract was in substance as follows: Mr. Fuller had been in the habit of shipping horses from that station once or twice a year for five or six years. On the day in question he inquired of the defendant's agent at West Park station the rate for his car and the agent figured it out and told him the amount, which he paid. He "wasn't in the office more than a minute or two;" the agent was sitting at his desk and said, "Sign this;" he said "I will sign this," and reached over and signed the contract; that he did not know it was a contract, but supposed it was a bill of lading; that he had signed papers before, but was never asked to read them and never read them and did not read this one; that he made no statements as to the value of the horse and the agent made no inquiries as to the same or anything else; that the plaintiff had no knowledge

of any other rates, various tariffs or the official classification, and not a word was said by the agent in explanation of or pertaining to them or the provisions of the contract; that the plaintiff had been often told that he had to sign the papers before they moved the horses and they wouldn't move them until he signed, and said: "I knew I had to sign it there because my horse wouldn't get pulled away from the station;" that he knew nothing of the clause limiting the liability to $100 until he afterward learned same from Mr. Lindemann, defendant's freight claim agent at Cleveland, by correspondence. Eight cars of horses were shipped from West Park on the day in question. The driving sulkies were billed and shipped with plaintiff's horses. The horse Bud Green had started in a race two or three days before. The agent testified: "I know he signed it when he was about to go, because after loading race horses we don't have much time before or after;" also that he supposed the horses were from the race track, but of his own knowledge did not know whether the horse in question was a race horse or not; and by that probably meant that, not having seen him race, he could not say of his own knowledge that he was a race horse. It would seem from all the circumstances that the agent had such information that he well understood the horse was a race horse. With such knowledge it was his duty to make inquiries and to explain to the plaintiff the rates and the contract, as instructed in the Official Classification hereinbefore quoted.

In the cases examined by us holding that a common carrier may, by contract, limit the amount of its liability for loss or damage in consideration of the reduced rate of transportation, it seems that the grounds on which these contracts are sustained, are, that it is a fair contract entered into between the parties, whereby, because of an agreed valuation, the consignor secures a cheaper rate. If, then, the valuation be fixed by agreement, manifestly the consignor, on suf-

Fuller v. L. S. & M. S. Ry. Co., 165 Ill. App. 279.

fering damages, will not be permitted to repudiate a valuation agreed to as a basis of his contract. In the opinion in B. & O. R. R. Co. v. Hubbard, *supra,* introduced in evidence and relied upon by the defendant, the court in holding such a contract valid, said: "This of course does not include the right of the carrier to arbitrarily limit liability for either acts of negligence or the amount of liability in case of loss of or damage to the property consigned. Nor does it extend to mere notices given by the carrier to the shipper, that a limited liability is being contracted for when the shipment is made. The transaction must amount to a contract on the subject, wherein the minds of the parties meet as in the making of other contracts."

Under the law of this state laid down in Wabash R. R. Co. v. Thomas, 222 Ill. 337; Coats v. C., R. I. & P. Ry. Co., 239 Ill. 154, and Kirby v. C. & A. R. R. Co., 242 Ill. 418, the burden of proof is on the carrier to show that the consignor assented to the terms and conditions of a contract, whereby the common carrier seeks to limit its liability. A considerable portion of a learned and very exhaustive brief of 189 pages by counsel for plaintiff in error, is devoted to a discussion attempting to demonstrate the error of the Supreme Court in the cases last cited. However, we shall endeavor to follow, without hesitation, as is our duty, the opinions of that court as we understand them; and suggest to counsel, if the case be submitted to the Supreme Court, that their views, so ably urged here, might be there very properly presented.

If we were to follow the Illinois rule mentioned and hold that the burden in this case was upon the defendant to prove the plaintiffs assented to the limitation clause in the contract, we would be foreclosed from finding for the defendant, for practically the only evidence of assent is plaintiffs' signature, and while the same might ordinarily be sufficient, yet in this class of cases it seems the rule is different in many jurisdictions.

In Coats v. C., R. I. & P. Ry. Co., *supra,* the court held that the rule of law in Iowa governed in that case. Accordingly the Ohio law as to the execution of the contract governs in this case. The only evidence in the record on this question is contained in B. & O. R. R. Co. v. Hubbard, *supra.* The court there said: "If it (the contract) was not made fairly and understood, or if Frazier (the shipper) was induced to sign it by fraud, deception or misrepresentation, then it would not be binding." There was no fraud, deception or misrepresentation in the case at bar. The court went further and held, "If it was not fairly made and understood * * * then it would not be binding." A question of very wide latitude, but evidently so intended by the Ohio court. In Hart v. Pennsylvania R. R. Co., 112 U. S. 331, the plaintiff introduced and relied upon a similar contract, and in holding it valid the court said: "The distinct ground of our decision in the case at bar is, that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld," etc., etc.

Was the contract "fairly made and understood" is a question of fact. The preponderance of the evidence is clear that the plaintiffs did not understand the contract, and the minds of the parties did not meet in an agreement on the value of the horse in question. Whether the contract was entered into "fairly" is by no means plain. The Ohio Supreme Court, in the language used, evidently meant something other than and not equivalent to fraud, deception or misrepresentation. Where it was the duty of the carrier, as it is shown to have been here, to inquire concerning the value of the horse and to make known and explain to the shipper the different rates, and the contract (in

all of which the carrier failed) and the situation is such that the shipper, as he testified, must sign the document presented or the carrier would refuse transportation of plaintiffs' stock, with all the other circumstances in the case,—was the jury in error in finding that the contract was not fairly made? While reasonable minds may differ on the question, yet the jury finding that the contract was not binding on the plaintiffs, we conclude that we cannot say that the verdict was clearly and manifestly against the weight of the evidence.

It being determined that from the evidence the contract was not, in the eye of the law, executed by plaintiffs, the clause therein providing for notice in a given manner, within a given time, is not binding on the plaintiffs, and their failure therein, if they did so fail, is no defense to the action.

In regard to the argument that plaintiff was conclusively presumed to have notice of the provisions of the Interstate Commerce Act, and to know the tariffs and the terms of the contract, the holding of the court in Kirby v. C. & A. R. R. Co., *supra,* and the language there used, is a complete answer.

The instructions of the court were, in our view of the case, more favorable to the defendant than the law required. The court announced in the instructions to the jury the correct rule relating to the execution of the contract as laid down in B. & O. R. R. Co. v. Hubbard, *supra,* and while there were some inaccurate expressions in some of the repetitions of the rule, which were also unnecessary, taking the instructions as a whole, we think they fairly laid down the correct rules of law governing the case.

We are not satisfied that the judgment herein, in the language of the Municipal Court Act, "resulted from substantial errors of said Municipal Court directly affecting the matter at issue between the parties."

The judgment is affirmed.

*Affirmed.*