# Cincinnati, New Orleans & Texas Pacific Railway Company v. Rankin.

(Decided May 14, 1913).

## Appeal from Boyle Circuit Court.

1. Carriers—Interstate—Liability—Contract Limiting Amount of Recovery—Validity.—An interstate carrier may, by fair, open and reasonable agreement, limit the amount recoverable by the shipper to an agreed value, made for the purpose of obtaining the lower of two or more rates proportioned to the amount of risk.

2. Carriers—Interstate—Carmack Amendment—Liability of Carrier.—In enacting the Carmack Amendment to the Interstate Commerce Act, it was not the purpose of Congress to lessen in the slightest degree the previously existing liability of the initial carrier, or of any connecting carrier; on the contrary, the purpose of the enactment was to continue the previously existing liability of both the initial and connecting carrier, and in addition, thereto, impose upon the initial carrier in certain cases liability that had theretofore existed on the part of the connecting carrier alone.

3. Carriers—Live Stock—Liability.—The carrier of live stock is a common carrier, and is liable for any loss or damage not due to the act of God or the public enemy or the public authority, or to the inherent or proper vice of the animals, unless attended by some negligence on his part.

4. Carriers—Live Stock—Failure to Deliver—Liability—Excepted Causes—Burden of Proof.—A failure of a carrier to deliver a shipment of live stock imposes upon him the burden of proving that the loss resulted from some cause for which he was not responsible in law or by contract.

5. Carriers—Tender—Pleading—Proof.—Where a carrier sells injured live stock, and plaintiff claims a conversion because the stock was sold without right or authority of law, and this allegation of the petition is denied, the carrier may, without pleading a tender, prove that the stock was tendered to plaintiff before the sale.

6. Carriers—Tender of Injured Stock—Refusal to Receive—Right to Sell—Conversion.—Where the shipper of live stock is both the consignor and the consignee, a carrier, after tender of the stock injured to the shipper, and his refusal to receive it, may sell the stock, and such sale will not amount to a conversion.

7. Carriers—Loss or Damage to Live Stock—Measure of Damages.—Where, by fair, open and reasonable agreement, the liability of a common carrier of live stock is limited to $75 per head, the measure of damages for stock killed is $75 per head, and for stock injured and sold by the carrier, after tender to the shipper and his refusal to accept, the measure of damages is $75 per head for the stock bringing less than that amount, while for the stock bringing more than that amount the measure of damages is the sale price of such stock less the expense of their sale and the reasonable

cost of their keep from the time that they were injured, the liability in no event to be less than $75 per head.

CHARLES H. RODES, GEORGE E. STONE, NELSON D. RODES and JOHN GALVIN for appellant.

CHAS. C. FOX and ROBERT HARDING for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

On November 6, 1911, David Rankin, Jr., acting for himself and as agent of his father, Robert Rankin, took twenty-seven mules and two horses to the stock pens of the C., N. O. & T. P. Railway Company at Danville, Kentucky, for the purpose of shipping them to Atlanta, Georgia. Of the stock in question eight mules and one horse belonged to Robert Rankin, while the remainder of the stock was the property of David Rankin, Jr. The stock was loaded about 10 o'clock p. m., and left Danville that night, bound for Atlanta. At about 3 o'clock p. m. on the following day the train carrying the stock was wrecked at Dayton, Tennessee. Sixteen of the mules were killed and the remainder of the stock more or less injured. Of Robert Rankin's stock, five mules were killed and three mules and one horse injured. The three mules and one horse that were injured were sold by the railroad company in Atlanta, Georgia, on December 19, 1911.

Plaintiff, Robert Rankin, brought this action against the railroad company to recover damages. The jury returned a verdict in his favor for the sum of $1,912.50. Judgment was entered accordingly, and the railroad company appeals.

Plaintiff based his right to a recovery on the fact that the five mules were killed while in possession of the defendant and by its negligence, and that the three mules and one horse belonging to plaintiff were sold by defendant without right or authority of law, and that the proceeds of the sale were converted by the defendant to its own use. In its original answer the defendant did not deny that the stock was killed and injured while in its possession, but did deny negligence, and the amount of damages alleged. It also denied that the stock disposed of by it in Atlanta was sold without right or authority of law.

Just prior to the time the stock was shipped, plaintiff's agent obtained from the company's agent at Dan-

ville a bill of lading which recites in substance that freight rates are determined by the value of the property shipped, and that the published rates of the company are based on the maximum valuation of mules and horses at $75 per head, and that for the shipment of stock of an increased value an increased rate must be paid.

During the progress of the case, defendant filed two amended answers which it is not necessary to consider. On April 10, 1912, it filed a third amended answer, pleading in substance that defendant was a common carrier of interstate shipments, and was subject to the provisions of the Interstate Commerce Act, enacted by Congress in 1887, and the several amendments thereto. The shipment of stock mentioned in the petition was an interstate shipment. As required by the federal statute, it had placed on file with the Interstate Commerce Commission a schedule of joint freight tariffs for live stock between Danville, Kentucky, and Atlanta, Georgia, and had kept open to public inspection at Danville, Kentucky, schedules showing the rates for transportation of live stock between Danville and Atlanta; and had likewise published the fact that the rates for horses and mules set forth in the tariff schedules were based on a maximum valuation of $75 per head, and that for the shipping of horses and mules of a greater value than $75 per head, the freight rate would be increased. In order for a shipper to obtain the rates as published, it was necessary for him to agree with the carrier that it should not in any case of loss or damage to the stock be liable for any sum in excess of the values stated in the freight tariff, which values the shipper should agree to be the true value of the animals, but if the shipper placed a higher valuation on his stock than $75 per head, then it would be necessary for him to pay an increased freight rate for the transportation of this stock. Defendant further pleaded that plaintiff's agent, with knowledge of its provisions, signed a contract agreeing that the liability of the defendant in the case of loss or damage to his stock should not exceed $75 per head, and that this was the just and true value of the animals being shipped; that defendant had no knowledge of the value of the animals except as obtained from plaintiff's agent, and that defendant's liability was limited to the sum of $75 per head. To this amended answer the trial court sustained a demurrer, to which action of the court the defendant duly objected and excepted.

The evidence discloses that the stock in question was not accompanied by either of the shippers or anyone representing them. The train carrying the stock in question was wrecked at Dayton, a small town in Tennessee. At the time of the wreck, the train, according to plaintiff's evidence, was going at the rate of 25 to 40 miles an hour. According to defendant's evidence, at the rate of about 20 miles an hour. The track going into Dayton is practically straight for a distance of about a mile. When the train reached the limits of Dayton, a cow suddenly darted in front of the engine from behind some standing cars, and colliding with the engine, caused it to leave the rail and overturn the car containing the stock in question. The injured stock, consisting of three mules and one horse, were detained in the possession of the defendant until December, 1911, when they were sold at public auction. The evidence further shows that just prior to the sale, the injured stock was tendered to plaintiff's agent, David Rankin, Jr., but that he refused to receive the stock on account of its condition. Thereafter the stock was sold, but the proceeds were never turned over to the plaintiff.

It is first insisted that the trial court erred in sustaining plaintiff's demurrer to the third amended answer of the defendant.

Section 196 of our Constitution provides: "No common carrier shall be permitted to contract for relief from its common law liability." Construing the foregoing section, in the case of Southern Express Co. v. Fox & Logan, 131 Ky., 257, this court held that a transportation contract arbitrarily fixing the carrier's liability at a certain sum was violative of the section in question and void, in the absence of a showing of fraud on the part of the shipper or his agent, of facts sufficient to constitute an estoppel at common law. In sustaining the demurrer in question the trial court based its action on the rule announced above.

The original Interstate Commerce Act of February 4, 1887, 24 Stat., 379, c. 104, was amended in many respects by the Act of June 29, 1906, 34 Stat. 584, c. 3591. Section 20 of the latter act, which is generally referred to as the Carmack Amendment, provides in part as follows:

"That any common carrier, railroad or transportation company receiving property for transportation from a point in one State to a point in another State shall issue

a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such prop-- erty may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability  hereby  imposed:  *Provided,* That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.''

Construing and interpreting this amendment, in the recent case of Adams Express Co. v. Croninger, 226 U. S., 491, the Supreme Court of the United States, while recognizing the rule that the liability of a carrier, although engaged in interstate commerce, for loss or damage to property carried may be regulated by state law, in the absence of legislation thereon by Congress, nevertheless held that Congress having, by  the  Carmack Amendment, legislated directly upon a carrier's liability for loss or damage to interstate shipments, such legislation superseded all regulations and policies of any particular State upon the same subject.  In discussing the validity of a contract of shipment similar to the one involved in this action, the court said:

''It has, therefore, become an established rule of common law, as declared by this court in many cases, that such a carrier may, by a fair, open, just and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk.''

Again the court said:

''That no inquiry was made as to the actual value is not vital to the fairness of the agreement  in  this case. The receipt which was accepted showed that the charge made was based upon a valuation of fifty dollars unless a greater value should be stated therein.  The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of  the  published schedules filed with the commission. That presumption is strengthened by the fact that across the top of this bill of lading there was this statement in bold type, 'This Company's charge is based upon the

value of the property, which must be declared by the shipper.' "

The same doctrine is re-affirmed in the cases of Chicago, Burlington & Quincy R. Co. v. Miller, 226 U. S., 513, and Chicago, St. Paul, Minneapolis & Omaha R. Co. v. Latta, 226 U. S., 519. It follows from the foregoing opinions that the trial court erred in sustaining the demurrer in question.

It is next insisted that the trial court erred in refusing to direct a verdict in favor of the defendant on the ground that the evidence utterly fails to show that the injury to the stock in question was caused by any act of the defendant or of any connecting carrier. In this connection it is argued that it was the purpose of the Carmack Amendment to impose liability upon the initial carrier only in the event that the loss or damage was "caused by it" or "caused by" any connecting carrier. Taking this view of the case, it is earnestly argued that the damage to the stock in question was in no sense "caused by" defendant. On the contrary, the proximate cause of the injury to the stock was the presence of the cow on the track at a place where her presence could not have been reasonably anticipated, and at a time when no amount of care on the part of defendant's employes could have prevented the wreck. As we understand the statute in question, it was not the purpose of Congress to lessen in the slightest degree the previously existing liability of the initial carrier or any connecting carrier. On the contrary, the manifest purpose of the enactment was to continue the previously existing liability of both the initial and connecting carrier, and in addition thereto to impose upon the initial carrier in certain cases the liability that had theretofore existed on the part of the connecting carrier alone. In other words, if the case is one where the connecting carrier was liable before the enactment of the statute in question, then, under and by virtue of the provisions of that act, the initial carrier is likewise liable. This view, we think, is fully sustained by the following language of Mr. Justice Lurton, in the case of Adams Express Co. v. Croninger, *supra*:

"What is the liability imposed upon the carrier? It is a liability to any holder of the bill of lading which the primary carrier is required to issue 'for any loss, damage or injury to such property caused by it,' or by any connecting carrier to whom the goods are delivered. The suggestion that an absolute liability exists for every

loss, damage or injury, from any and every cause, would be to make such a carrier an absolute insurer and liable for unavoidable loss or damage though due to uncontrollable forces. That this was the intent of Congress is not conceivable. To give such emphasis to the words, 'any loss or damage' would be to ignore the qualifying words, 'caused by it.' The liability thus imposed is limited to 'any loss, injury or damage caused by it or a succeeding carrier to whom the property may be delivered,' and plainly implies a liability for some fault in its common law duty as a common carrier.''

It remains to consider what is the liability imposed by the common law. The general rule as to the common carrier's liability with reference to goods in its possession as carrier, and regardless of any contractual exceptions, is that he is liable for all loss or destruction of or injury to such goods not occasioned by the act of God or the public enemy. Since the original statement of the rule, certain exceptions thereto have become well recognized, and a more accurate statement of the carrier's liability under such circumstances is that he is liable for all loss or injury not due to the act of God or the public enemy or the public authority, or to the inherent nature or qualities of the goods, or the act or fault of the shipper or his agent. And even in the excepted cases the carrier may become liable if, by the exercise of reasonable care, he could have avoided or lessened the loss or damage. 6 Cyc, 376; Hutchinson Carriers, 3rd Ed., sec. 265.

While it is sometimes said that a railroad is not a carrier of live stock with the same responsibilities which attend it as a carrier of goods, and that the nature of the property, the inherent difficulties of its safe transportation, and the necessity of furnishing to the animals food and water, light and air, and of protecting them from injuring each other, imposes duties in many respects widely different from those devolving upon a mere carrier of goods; North Pa. R. Co. v. Com. Nat. Bank of Chicago, 123 U. S., 727; and while some of the authorities hold that carriers of live stock are not liable as common carriers, but only bound to transport with ordinary care and skill; Heller v. Chicago, etc., R. Co., 109 Mich., 53, 63 Am. St. Rep., 541; Baker v. Louisville, etc., R. Co., 10 Lea (Tenn.), 304; yet the decided weight of authority is that a carrier receiving live stock for transportation does so under the usual liabilities attached to a carrier of goods, and so, omitting certain exceptions not material to the

consideration of this case, it is the general rule that the carrier of live stock is liable for any loss or damage not due to the act of God or the public enemy or to the inherent or proper vice of the animals, unless attended by some negligence on his part.  6 Cyc, 371; Hutchinson Carriers, sec. 339; Kansas Pac. R. Co. v. Nichols, 9 Kan., 235; Evans v. Fitchburg R. Co., 111 Mass., 142; R. Co. v. Williams, 61 Neb., 608, 85 N. W., 832, 55 L. R. A., 289; Waldron v. Fargo, 170 N. Y., 130, 62 N. E., 1077; R. R. v. Dies, 91 Tenn., 177, 18 S. W., 266, 30 Am. St. Rep., 871; Kinnick v. R. R. Co., 69 Iowa, 665, 29 N. W., 772; Hall v. Renfro, 3 Metc. (Ky.), 51; Stiles, Gaddice & Stiles v. L. N. R. R. Co., 129 Ky., 175; South, etc., R. R. Co. v. Henlein, 52 Ala., 606; Fordyce v. McFlynn, 56 Ark., 424, 19 S. W., 961; R. R. Co. v. Rainey, 19 Colo., 225, 34 Pac., 986; Cooper v. R. R. Co., 110 Ga., 659, 36 S. E., 240; Ohio, etc., R. Co. v. Dunbar, 20 Ill., 623; Evansville, etc., R. Co. v. Young, 28 Ind., 516; McCoy v. R. Co., 44 Iowa, 424; Kansas, etc., R. Co. v. Reynolds, 8 Kan., 623; Sager v. R. R. Co. 31 Me., 228; Evans v. R. R. Co., 111 Mass., 142.

In the present case the defendant was in possession of the stock as a common carrier.  Having received possession of the stock it was charged with the duty of delivering them or explaining why that had not been done. If the failure to deliver was due to the act of God, the public enemy, the public authority, or to the inherent nature of the live stock or the act or fault of the shipper or his agent, or to some other cause against which it might lawfully contract, it was for the carrier to bring itself within such exceptions.  Galveston, Harrisonburg & San Antonio Railway Co., &c. v. Wallace, 223 U. S., 481, 56 L. Ed., 516. In this case there was no attempt on the part of defendant to bring itself within any of the above exceptions.  On the contrary, the facts, which are not disputed, show that the injury to the stock was caused by the wreck.  That being true, defendant is liable.

What, then, is the measure of damages?  It appears that five of the mules belonging to plaintiff were killed, while three mules and one horse were injured.  Plaintiff contends that there was a conversion of the injured stock. In this connection he insists that there was no plea that the stock were tendered to him, and that this evidence should have been excluded.  Plaintiff, however, alleged that the injured stock was sold without right or legal

authority, and the issue was joined upon this question. Whether or not the stock was converted depended upon the facts. For the purpose of showing that there was no conversion, defendant had a right to show the facts. We therefore conclude that it was not necessary to plead a tender, but that under a general denial of conversion the tender could be shown. While ordinarily a carrier has no right to sell the property of a shipper or consignee, we think under the facts of this case a sale was justified. The shipper and the consignee were the same person. The carrier was therefore under no duty, upon the refusal of the consignee to receive the goods, to notify the consignor of this fact. Nor was he under any duty to hold the live stock indefinitely and incur the expense necessary for its keep. When the shipper refused to receive the stock, defendant had a right to dispose of it upon the best terms possible, and such sale did not constitute a conversion. If upon the issue joined it should turn out that the contract limiting the defendant's liability to $75 per head was fairly made, then defendant's liability for each of the mules killed is limited to that amount. For the stock injured, and which was sold for less than $75 per head, defendant is liable to the extent of $75 per head, but as to the stock which was sold for an amount in excess of $75 per head, defendant is liable for the amount actually received, less the expense of their sale and the reasonable cost of their keep from the time that they were injured, the liability in no event to be less than $75 per head.

Should it turn out that the agreement limiting defendant's liability to $75 per head was obtained by fraud or deceit, then the ordinary measure of damages will apply, with the exception that the court must take into consideration the fact that the defendant is liable for the proceeds of the sale of the injured stock retained by it, less the expense of sale and the reasonable cost of the keep of the stock from the time of their injury.

Judgment reversed and cause remanded **for new** trial consistent with this opinion.