AMERICAN COTTON PRODUCTS COMPANY, INC., Plaintiff, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY, Defendant.

Municipal Court of New York, Borough of Manhattan, Ninth District, February 25, 1932.

M. J. O'Callaghan, for the plaintiff.

Jacob Aronson [K. O. Mott-Smith of counsel], for the defendant.

GENUNG, J. This cause is submitted a second time to this court on an agreed statement of facts. On the first submission judgment was rendered in favor of the plaintiff. On appeal counsel for the parties stipulated to submit, in addition to the record, a circular issued by the New York Central Railroad Company entitled "Rules and Charges Governing the Diversion or Reconsignment of Carload Freight, etc." The judgment was reversed and a new trial ordered on the ground that the trial court did not have this circular before it at the time of its decision.

The parties have stipulated additional facts and submitted with the stipulations an uncertified copy of Tariff Circular No. A-568 and Supplement 5 thereto, issued by the defendant and in effect on the date of shipment and forwarding from Rochester, which counsel have stipulated were duly filed with the Interstate Commerce Commission, and extracts from Circular S. L. No. 1775, I. C. C. No. A-6824, issued by the Seaboard Air Line Railway Company, concurred in by the Atlantic and Western Railroad Company and duly certified by the Secretary of the Interstate Commerce Commission to have been filed and effective at the times involved in this controversy. The material facts may be stated thus:

On December 12, 1922, at Lillington, N. C., the Farmers Cotton Oil Company, on behalf of the plaintiff, delivered to the Atlantic and Western Railroad Company, fifty-four bales of cotton seed hull shavings to be transported to Rochester, N. Y., and delivered to the order of the Cotton By-Products Company. The bill of lading provided that the notice of arrival of the shipment at destination be given to the plaintiff in Rochester. Defendant's car "N. Y. C. 260880" was used to convey the cargo to destination. The routing included the Seaboard Air Line Railway as an intermediate or connecting carrier in the course of the transit. On December 20, 1922, the plaintiff sent a telegram to the shipper at point of origin, as follows: "Referring to shipment fifty-four bales linters from your mill by Steele By-Products Company to us at Rochester, New York, car N. Y. C. two six naught eight eight naught please have agent change destination on this car to New Glasgow Nova Scotia have him wire us as soon as he has located car we will send lading to have change noted thereon.

"AMERICAN COTTON PRODUCTS."

The telegram was received *in toto* by the Atlantic and Western Railroad Company at Lillington on December 24, 1922. The shipment arrived at Rochester over the defendant's rails at one o'clock on the morning of December 26, 1922. The defendant promptly and on the same day mailed to the plaintiff in Rochester a written notice of arrival of the car. The plaintiff, upon its receipt, transferred the notice together with an order for delivery of the shipment to the Flour City Bedding Corporation of Rochester, on behalf of which a demand for delivery of the shipment was made to defendant.

Subsequent to the arrival of the car at destination and the mailing by the defendant of the notice of arrival to the plaintiff, the initial carrier repeated the plaintiff's telegraphic order to the Seaboard Air Line Railway on December 26, 1922. On December 27, 1922, the carrier last mentioned "instructed the defendant at Rochester, N. Y., to reforward the shipment to plaintiff at New Glasgow, Nova Scotia, which order was executed and all charges which accrued up to Rochester, N. Y., were billed as advances." The reforwarding occurred prior to the demand of the Flour City Bedding Corporation for delivery. The freight arrived at New Glasgow on January 10, 1923, over the lines of the Canadian National Railway, which company promptly notified the plaintiff of the fact. The plaintiff refused to accept delivery at New Glasgow. On March 5, 1923, the plaintiff, under protest, took delivery at that point and paid charges amounting to $421.58, which included $51.81 for transportation from Lillington to Rochester, $6.50 for change in destination at Rochester, $191.27 for transportation from Rochester to New Glasgow, and $172 demurrage accruing at New Glasgow.

The shipment covered 1,883 miles from point of origin to New Glasgow, whereas had destination been changed in transit it would have traveled between 1,708 miles to 1,863 miles, depending upon the junction point at which the car could be overtaken and redirected. The rate and amount of charges from Lillington to New Glasgow would have been the same whether routed via Rochester or some prior junction point except that in this case the plaintiff was charged by defendant the sum of six dollars and fifty cents for changing the destination after arrival at Rochester. It does not appear on what date and at what time the Flour City Bedding Corporation made demand for delivery at Rochester nor whether defendant made any effort to stop the car in transit from Rochester to New Glasgow and return it to Rochester. From the agreed statements of facts, considered with the two circulars referred to above, it would appear that the car moved on separate waybills

from Lillington to Rochester and from Rochester to New Glasgow. The tariff circular issued by the Seaboard Air Line Railway and concurred in by the Atlantic and Western Railroad Company provides, in part:

" RULES AND CHARGES GOVERNING THE DIVERSION OR RECON-
SIGNMENT OF CARLOAD FREIGHT.

" *Application.*

" Freight in carloads, except as provided below, may be diverted or reconsigned on this Company's lines, subject to the following rules, regulations and charges.

" If request is made for the diversion or reconsignment of freight in carloads, this Company will make diligent effort to locate the shipment and effect diversion or reconsignment, but will not be responsible for failure to effect the diversion or reconsignment desired unless such failure is due to the negligence of its employees.

" *Definition.*

" For the purpose of applying these rules, the term ' Diversion ' or ' Reconsignment ' means:

" (a) A change in the name of the consignee.

" (b) A change in the name of the consignor. (See Rule 6, page 4.)

" (c) A change in destination. (See Rule 5, page 4.)

" (d) A change in route at the request of consignor, consignee or owner.

" (e) Any other instructions given by the consignor, consignee or owner necessary to effect delivery which requires a change in billing or an additional movement of the car or both. (See Section (b) of Exceptions, page 3.)

" *Conditions.*

" The services herein authorized are subject to the following conditions:

" (c) On straight consignments the original bill of lading should be surrendered or other proof of ownership established. On shipments consigned ' to Order ' original bill of lading should be surrendered for endorsement or exchange or in its absence satisfactory bond of indemnity executed in lieu thereof, or other approved security given at the time the diversion or reconsignment order is placed.

" (d) Request for diversion or reconsignment must be made or confirmed in writing.

" (e) Prepayment or Guarantee of Charges: All charges accruing under these rules must be paid or guaranteed to the satisfaction

of the carrier by the person or persons requesting the diversion or reconsignment or reforwarding before shipments are forwarded.

### " Rules and Charges.

" Rule 4. (a) Application. The rules published herein governing the diversion or reconsignment of freight are applicable while the freight is in possession of this Company, also when it has reached billed destination on this line and has been delivered to switching road for placement.

" (c) Diversions or Reconsignments Beyond Rails of this Company. When diversion or reconsignment is requested after shipment has passed out of possession of this Company, or when request is received too late for this Company to effect the change desired, such request will be transmitted to direct connecting carrier to which shipment was delivered, when the responsibility of this Company will end; and the shipment will be subject to rules of the carrier on whose rails the diversion or reconsignment is accomplished (except as per section (a) of this rule)."

Supplement 5 to defendant's Tariff Circular No. A-568 provides: " Note C. In no case will it be permissible to divert or reconsign a car, after arrival at station to which first consigned, to a new destination at aggregate charge lower than currently published through rate from original point of shipment to original destination, plus diversion or reconsignment charge and detour or back haul charge, as provided in Rule 8 (a), 10, 11, 11 (a) and 11 (b); also switching charge, if any, as provided in Rule 11 (c)."

The circular itself contains among other things, the following:

### " Section 1.

#### " Rules and Charges Covering the Diversion or Reconsignment of Carload Freight.

### " Application.

" Freight, in carloads, except as provided below, may be diverted or reconsigned on this company's lines subject to the following rules, regulations and charges.

" If request is made for the diversion or reconsignment of freight, in carloads, this company will make diligent effort to locate the shipment and effect diversion or reconsignment, but will not be responsible for failure to effect the diversion or reconsignment desired, unless such failure is due to the negligence of its employes."

Then follow Definition, Conditions, Rules and Charges identical with those quoted above. In addition, the Rules and Charges provide:

*" Diversion or Reconsignment in Transit.*

" Rule 7. If a car is diverted or reconsigned in transit prior to arrival at original destination, or if the original destination is served by a terminal yard, then prior to arrival at such terminal yard, a charge of $3.00 per car will be made for such service.

*" Diversion or Reconsignment to Points Outside Switching
Limits Before Placement.*

" Rule 10. If a car is diverted, reconsigned or reforwarded on orders placed with local freight agent or other designated officer after arrival of car at original destination, but before placement for unloading, or if the original destination is served by a terminal yard, then after arrival at such terminal yard, a charge of $7.00 per car will be made if car is diverted, reconsigned or reforwarded to a point outside of switching limits or original destination.

*" Diversion or Reconsignment to Points Outside Switching
Limits After Placement.*

" Rule 12. If a car has been placed for unloading at original billed destination and reforwarded therefrom without being unloaded, to a point outside of the switching limits, it will be subject to the published rates to and from the point of reconsignment, plus seven dollars ($7.00) per car reconsignment charge, except that in no case shall the total charge be less than the charge based on the through rate from point of origin to final destination, plus $7.00 per car reconsignment charge. (See Note.)

" Note.— If a car has been placed for unloading on a public delivery track, but has not been unloaded or accepted by consignee or owner, it will be subject to Rule 10."

The plaintiff claims that by forwarding the shipment from Rochester to New Glasgow the defendant violated the contract of carriage as a result of which plaintiff sustained damages aggregating $452.20.

The defendant claims that the forwarding was in accordance with plaintiff's instructions and that the facts do not show what damages, if any, the plaintiff has sustained.

The shipment being one in interstate commerce, the rights and liabilities of the parties depend on the Federal act to regulate commerce among the several States and adjacent foreign countries, the bill of lading and the common-law principles accepted and enforced by the Federal courts. (*Feynman* v. *American Ry. Exp. Co.*, 134 Misc. 223, 225; *Southern Exp. Co.* v. *Byers*, 240 U. S. 612, 614; 36 S. Ct. 410; 60 L. Ed. 825; L. R. A. 1917A, 197; *Southern Ry. Co.* v. *Prescott*, 240 U. S. 632, 639, 640; 36 S. Ct. 469; 60 L. Ed.

836; *Kansas City So. Ry. Co. v. Carl,* 227 U. S. 639, 649; 33 S. Ct. 391; 57 L. Ed. 683; *Adams Exp. Co. v. Croninger,* 226 U. S. 491; 33 S. Ct. 148; 57 L. Ed. 314; 44 L. R. A. (N. S.) 257; *Chicago, B. & Q. Ry. Co. v. Miller,* 226 U. S. 513, 518; 33 S. Ct. 155; 57 L. Ed. 323; *Missouri, Kansas & T. Ry. Co. v. Harriman Bros.,* 227 U. S. 657, 672; 33 S. Ct. 397; 57 L. Ed. 690; *Burke v. Union Pacific R. R. Co.,* 226 N. Y. 534, 538; *Barnet v. New York C. & H. R. R. R. Co.,* 222 id. 195, 198; *O. K. Display Fixture Co. v. American Railway Exp. Co.,* 121 Misc. 816, 818.) The Interstate Commerce Act, as amended, requires any common carrier subject to the act to issue a bill of lading for property received by it for transportation in interstate commerce and makes that carrier liable for any loss or damage to the property in transit, whether or not the loss or damage occurs on its own lines or on those of a connecting or delivering carrier. (Int. Com. Act [U. S. Code, tit. 49, § 20, subd. 11].) The bill of lading issued by the Atlantic and Western Railroad Company for the shipment here involved together with the classifications and schedules, including the tariff circulars quoted above, on file with the Interstate Commerce Commission, constituted the contract of carriage. (*Feynman v. American Railway Exp. Co., supra; Burke v. Union Pacific R. R. Co., supra; O. K. Display Fixture Co. v. American Railway Exp. Co., supra; Strahs v. New York C. R. R. Co.,* 113 Misc. 273.) While each carrier over whose lines the shipment passes may be compelled to respond in damages for its own default, the liability of such carrier is that imposed by the act as measured by the original contract of shipment so far as it is valid under the act. (*Wabash Ry. Co. v. Holt,* 263 Fed. 72, 74; *Georgia, etc., R. Co. v. Ward,* 244 U. S. 383, 387.) The Uniform Bill of Lading prescribed by the Interstate Commerce Commission on· April 14, 1919 (*Matter of Bills of Lading,* 66 I. C. C. 63, 64; *Matter of Bills of Lading,* 64 id. 357; *Matter of Bills of Lading,* 52 id. 671), as amended, contains these clauses:

" RECEIVED,................the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated below, which said company (which word company is to be understood throughout the contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be

performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained (including conditions on back hereof) which are hereby agreed to by the shipper and accepted for himself and his assigns.

" Conditions.

" Sec. 1. The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

" Sec. 4(a). Property not removed by the party entitled to receive it within the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly set or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage, and to carrier's responsibility as warehouseman, only, or, at the option of the carrier, may be stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage.

" Sec. 10. Any alteration, addition, or erasure of this bill of lading which shall be made without the special notation hereon of the agent of the carrier, issuing this bill of lading, shall be without effect and this bill of lading shall be enforceable according to its original tenor."

The bill of lading serves three distinct functions: *First*, a receipt for the goods; *second*, a contract for their carriage; and *third*, documentary evidence of title to the goods. As a receipt, it recites the place and date of shipment, describes the goods as to quantity, weight, dimensions, identification marks and conditions, quality and value. As a contract, it names the contracting parties, which includes the consignee, fixes the route, destination and freight rate or charges, and stipulates the rights of and obligations assumed by the parties. (*Meyer* v. *Peck*, 28 N. Y. 590; *Ellis* v. *Willard*, 9 id. 529.) To change the consignee or destination would require a modification of the contract. The owner of goods transported by a common carrier has the right to have his consignment, *while in transit, diverted at any intermediate point through which it passes.* (*Ryan* v. *Great Northern Ry. Co.*, 90 Minn. 12, 14; 95 N. W. 758; Hutch. Carr. [2d ed.] 337.) The diversion to a different destination under the original contract must be accomplished prior to the arrival

of the property at the original destination. (*Melbourne* v. *Louisville & N. R. R. Co.*, 88 Ala. 443, 448, 449; 6 So. 762.) In so far as transportation is concerned, the carrier's obligation terminates when the goods reach the original destination. Hence, transit beyond the original destination usually requires a new contract. (*Pere Marquette Ry. Co.* v. *French*, 254 U. S. 538; *Howell* v. *Barrett*, 156 App. Div. 849, 853; *Sheehy* v. *Wabash R. R. Co.*, 169 Mich. 604; *Taylor* v. *Central of Ga. Ry. Co.*, 121 S. E. 348; *Melbourne* v. *Louisville & N. R. R. Co.*, *supra.*) The forwarding of goods after arrival at destination is what is usually termed a " reconsignment " and where the carrier over whose lines the property is to proceed from the original destination on the reconsignment is not the same as the initial carrier issuing the bill of lading, the new contract of carriage is made not with the initial carrier as a party but with the carrier performing the additional transportation.

It is argued on defendant's part that the " Definition " contained in its tariff circular quoted above destroys any distinction existing between a " diversion in transitu " and a " reconsignment." True, it is, that " for the purpose of applying rules in this section, the term ' *Diversion* ' or ' *Reconsignment* ' means: (c) A change in destination." This, no doubt, was intended to avoid confusion by eliminating the use of technical terms in common dealings which depend on inartificial phrases and forms. The rules in the circular appear to use the terms interchangeably. But a " change in destination," by whatever name applied to it, may be effected *in transitu* or after arrival of the shipment at its original destination, and this distinction in service is definitely recognized in these same rules of the defendant. (Rules 7, 9, 10, 11, 12 and 13, pages 7, 8 and 9, Defendant's Tariff Cir. No. A-568.) The direction in this case was a " change in destination " and the question turns, not on abstract definitions or terminology, but on actuality. Did the plaintiff intend a " change in destination " *in transitu* or after arrival at the original destination?

A change after arrival at destination is the more costly course in time, in transit, in handling and in charges. In the instant case the telegraphic instructions were given prior to the arrival of the goods at destination. It is manifest from the wording of the directions considered in conjunction with the clauses of the Uniform Bill of Lading (*supra*) and subdivision (c) of the conditions contained in defendant's circular No. A-568 (*supra*) that the parties recognized that in order to effect a change of destination it would be necessary to first *locate* the car. The directions clearly contemplated *location* of the car *prior* to arrival at the original destination and telegraphic advice upon location that the change in destination could be made

*in transitu.* They also contemplated submission of the *order* bill of lading so that the modification of the original contract could be made in the manner prescribed by the rules of the carriers. A change in destination *in transitu* was directed. If a change after arrival at original destination had been intended, it would have been simpler to effect this at Rochester after arrival of the shipment.

The conditions governing a change in destination contained in both tariff circulars (S. L. No. 1775 of Seaboard Air Line Ry. Co. and No. A-568 of the defendant) are as much a part of the contract of carriage as the bill of lading and are binding on consignee and carrier alike. (*Burke* v. *Union Pac. R. R. Co., supra.*) The carrier cannot waive the terms of its contract. (*Georgia, etc., R. Co.* v. *Blish Milling Co., supra.*) In fact, the lawfully filed tariff regulations practically have the effect of a statute. (*Louisville & Nash. R. R. Co.* v. *Maxwell,* 237 U. S. 94.) The plaintiff, therefore, was entirely within its rights in proceeding on the assumption that the carriers would not ignore the very conditions which they themselves prescribed and, by including such conditions in their filed tariffs, gave them practically the effect of enacted law.

The change in destination in this case was effected by the defendant after arrival at the original destination. For the disregard of its directions, the plaintiff might look to the initial carrier, or any *guilty* carrier *en route,* to reimburse it for any damages resulting from an unreasonable delay in ultimately procuring a delivery at the final destination desired in addition to the difference between the through freight charges to such point from the point of origin and the freight charges actually paid.

But in this case only the request to change destination *in transitu* was given. The car was not located in transit, the plaintiff not notified by telegram, and the original contract never modified in the manner prescribed by the lawfully filed tariffs. When the shipment arrived at destination the defendant gave notice of arrival to the plaintiff. The usual form in use by the carriers constitutes a combined notice of arrival, freight bill and, upon delivery, the consignee's receipt is obtained on the duplicate. This was equivalent to a tender of delivery at Rochester and a demand for the payment of the freight charges by the defendant under the original agreement, especially in view of section 4 of the terms and conditions of the Uniform Bill of Lading (*supra*). No direction to change the destination after arrival at the original destination was given to the initial carrier or to the defendant and the plaintiff was entitled to delivery under the original contract.

Inasmuch as the defendant did not complete performance of the contract by a delivery of the property at Rochester, the plaintiff

was entitled to complete the performance and the defendant would then be responsible for the increased cost of transportation over and above the proper charges on the shipment which the plaintiff would be required to pay to complete performance. (*Spann* v. *Erie Boatman's Transp. Co.*, 11 Misc. 680; *Lumberman's Min. Co.* v. *Gilchrist*, 55 Fed. 677.) The fact that it does not appear that the plaintiff paid for transporting the property from New Glasgow to Rochester cannot defeat recovery of that part of the damages admitted. If the plaintiff does not demand its full damages the defendant should not be heard to complain. That part of the plaintiff's damage which does appear from the record is $191.27.

When the goods were tendered at New Glasgow, the plaintiff refused to accept delivery at that point. This was consistent with its rights under the contract of carriage. From this fact and the position taken by the defendant, viz., that the reconsignment was authorized, we may conclude that the defendant declined to complete the contract by delivery at Rochester. The plaintiff obviously waited a reasonable time for the defendant to perform before taking delivery under protest to prevent a complete loss of the property and to mitigate its damages as it was required to do. The payment under protest of $172 for demurrage charges upon delivery at New Glasgow was necessary under the circumstances to complete performance of the contract.

In addition, the plaintiff concededly was charged with and paid six dollars and fifty cents for a change in destination after arrival at the original destination, which charge would not have been made had the change been made *in transitu*.

Judgment is directed to be entered in favor of the plaintiff and against the defendant for the sum of $369.77, with interest from March 5, 1923.