WALD-GREEN FOOD CORPORATION, Plaintiff, *v.* ACME FAST FREIGHT, INC., Defendant.

Municipal Court of the City of New York, Borough of Brooklyn, April 2. 1951.

*Goetz & Goetz* for plaintiff.

*Clark, Carr & Ellis* for defendant.

FEIDEN, J. Plaintiff is a distributor of food products. On January 17, 1947, it delivered to defendant, concededly a freight forwarder, 100 cartons of 35-pound cans of imitation raspberry flavor fruit filling for shipment to Poinsetta Cake Co., Tampa, Florida, for the sales price of $525. This filling was manufactured within a few days prior to shipment and was packed in airtight metal cans, each can being placed in a corrugated carton. Plaintiff's uncontradicted testimony is that this merchandise would not under normal handling, deteriorate or spoil by reason of weather conditions in from four to six months. The defendant issued its regular bill of lading for the shipment, which arrived in Tampa, Florida, on January 27, 1947. There is some evidence that upon arrival, the lids of two cans had been damaged. The shipment could not be delivered because the consignee had gone out of business. Defendant placed the merchandise in storage and on February 19th, notified plaintiff by letter of its inability to make delivery, at the same time requesting that instructions as to disposition of the shipment be sent directly to its Florida station.

On receipt of this notice, plaintiff resold the merchandise to Lawler Co., San Antonio, Texas, and instructed defendant to ship the merchandise to that purchaser, freight collect. No new bill of lading was issued to plaintiff on this reconsignment. However, defendant was named as shipper in the bill of lading on the shipment to Texas. Defendant collected $75.93 from plaintiff for the shipment to Tampa and $45.73 for storage at Tampa from January 29th to March 6th. On arrival of the merchandise in San Antonio, Texas, the consignee paid the freight of $117.03. The cartons and shipping containers on arrival showed rough handling and were in a damaged condition. A very heavy mold had formed on top of the fruit filling. The filling itself was soured, discolored and spoiled and the merchandise was worthless. Plaintiff repaid to Lawler

the $117.03. The parties have stipulated that in the event plaintiff is entitled to recover, the damages shall be $633.50.

The Supreme Court of the United States in the case of *United States* v. *Chicago Heights Trucking Co.* (310 U. S. 344, 345–346) described the nature of the business of freight forwarders as follows:

"Forwarders utilize common carriers by rail and motor truck to transport goods owned by others. They solicit and obtain many small shipments, from various points within an area, and cause them to be carried in less than truck-load or carload lots to a concentration center within the area. There they are assembled by the forwarder for further transportation in truck-load or carload lots. Although the forwarder gives owners of individual small shipments his own contract corresponding in form to through bills of lading and assumes responsibility for safe through carriage, the forwarder customarily arranges for the pickup, assembly and transportation of the shipments by carriers for hire. And the forwarders, not the owners of the goods, select the carriers and route the shipments. Upon arrival of a truck-load or carload of the assembled small shipments at a distribution center, the bulk shipment is broken up, the forwarder separates and takes possession of the original small shipments and arranges, where necessary, their further carriage to their various final destinations in the area served by the particular distribution point. In this final carriage of the small shipment to its ultimate destination, the forwarder again utilizes carriers for hire to move these less than truck-load or carload lots. Thus, forwarders may use the service of carriers to assemble shipments of less than truck-load or carload lots at their concentration center, to transport the assembled truckload or carloads to a distribution center and to carry the broken up small shipments beyond their break-bulk distribution center.

"The forwarding business has been built upon the expectation that a material part of the transportation which it causes to be provided for small shippers can by consolidation of small shipments be obtained at truck-load or carload rates. For the forwarders' business was originally made profitable because it could operate upon the margin of profit represented by the difference between railroad carload rates paid by the forwarder and the higher rates, approximating less than carload rates, which the forwarder charged the owner of a shipment."

It is to be particularly noted that the freight forwarder reserves to himself the means of transportation and the routing. The specific manner or agency by which the services are to be performed does not enter into the contract of carriage with the owner or consignor. Whether or not the freight forwarder owns the means of transportation, his liability is that of a common carrier. (*Chicago, M., St. P. & P. R. R. Co.* v. *Acme Fast Frgt.*, 336 U. S. 465; *Bare* v. *American Forwarding Co.*, 146 Ill. App. 388, affd. 242 Ill. 298; *Read* v. *Spaulding*, 30 N. Y. 630; *Slutzkin* v. *Gerhard & Hey*, 199 App. Div. 5; *Krender* v. *Woolcott*, 1 Hilt. 223; *Kettenhofen* v. *Globe Transfer & Stor. Co.*, 70 Wash. 645, Note, 42 L. R. A. [N. S.] 903; *Garberson* v. *Trans-Continental Frgt. Co.*, 51 Wash. 213; *Merchants' Desp. Transp. Co.* v. *Bloch Bros.*, 86 Tenn. 392; *Merchant Shippers Assn.* v. *Kellogg Express & Draying Co.*, 28 Cal. 2d 594; *Heath* v. *Judson Frgt. Forwarding Co.*, 47 Cal. App. 426; *Highway Frgt. Forwarding Co.* v. *Public Service Comm.*, 108 Pa. Superior Ct. 178.) Section 402 of Part IV of the Interstate Commerce Act (U. S. Code, tit. 49, § 1002) provides that the freight forwarder '' assumes responsibility for the transportation of such property from point of receipt to point of destination ''.

Defendant's contentions that its obligation terminated when the merchandise was delivered to the rail carrier for the shipment to Texas and that its service in arranging for such shipment was gratuitous, or that at most, it acted as plaintiff's agent, must be overruled. There is no dispute that when the shipment was refused in Tampa, defendant wrote to plaintiff for instructions and was requested to ship the merchandise to San Antonio, Texas. The merchandise was still in defendant's possession. The instructions to send the goods to Texas constituted a reconsignment. Where a reconsignment is made while goods are still in possession of the initial carrier, the latter is liable for failure to transport them safely to the destination indicated in the reconsignment. (*Starks Co.* v. *Michigan Central R. R. Co.*, 207 Ill. App. 333; *Chesney* v. *Union P. Ry. Co.*, 209 Ill. App. 494; 13 C. J. S., Carriers, § 406.) Where both shipper and carrier agree on a further point of delivery, that point then becomes the real destination. (*Panhandle & Santa Fe Ry. Co.* v. *Reynolds*, 33 S. W. 2d 249 [Tex.].) Only where arrangements for the reconsignment are made with a new carrier is the original carrier's obligation terminated. (*American Cotton Products Co.* v. *New York Central R. R. Co.*, 142 Misc. 821, 829.) Defendant's bill of lading continued in force by the concurrence of the parties in a change of destina-

tion. (*Gulf, C. & S. F. Ry. Co.* v. *Texas Packing Co.*, 244 U. S. 31; *Chicago, R. I. & P. Ry. Co.* v. *Robinson & Co.*, 180 Ark. 911.) This change was not a new contract in the sense that the original contract had been completed, but a modification which became in effect a part of the original agreement (*Warley Fruit & Produce Co.*, v. *Louisville & Nashville R. R. Co.*, 17 Ala. App. 263) and so comes within the concept of reconsignment.

In *Schlitten* v. *Hines* (196 App. Div. 254, Hines, as Director General of Railroads being the operator of the steamship company known as the Savannah Line) an almost identical case, plaintiff's assignor shipped 40 bales of bags from New York City to Conyers, which is a short distance inland from Savannah, Georgia. The goods were transported by defendant's boat to Savannah, and thence by rail on the Central Railroad of Georgia to Conyers. The consignee rejected the shipment, whereupon the goods were placed in storage by the railroad company. The defendant then wrote to plaintiff's assignors asking for instructions. Plaintiff instructed defendant to send the goods to Philadelphia. Shipment was then returned to Savannah by the Central Railroad of Georgia, placed on board one of defendant's vessels and returned to New York, when it should have been sent on to Philadelphia. There was also a long delay in delivering the goods in Philadelphia. These circumstances caused considerable loss to plaintiff, as a result of which action was brought for damages. The defendant in that case argued as herein that his obligations terminated when the consignee refused to accept the shipment and that his subsequent actions were gratuitous or in the nature of an accommodation. Defendant also argued, as does the defendant in this action, that at most it was acting as agent for the plaintiff. The court overruled all these contentions, saying (pp. 257–258) : '' But, if it be a fact that after the nonacceptance of the goods by the purchaser in Georgia the parties in effect entered into a new contract for the reshipment of the goods, then the defendant would be deemed to be the initial carrier from Georgia to Philadelphia.''

The defendant in this case was the initial carrier on the reconsignment, and so, if not liable on the theory that there was one through shipment from Jersey City to San Antonio through Tampa, is nevertheless liable as the initial carrier on the trip from Tampa to San Antonio. The defendant, by remaining silent as to its relationship to plaintiff, could not unilaterally change its status from freight forwarder to agent. Whether the new arrangement is termed a reconsignment, a

modification of the original agreement, an establishment of a new destination, or a new contract, defendant was liable either as an initial carrier from Jersey City to Texas or initial carrier from Tampa to Texas.

It was the intention of the Carmack Amendment (U. S. Code, tit. 49, § 20, subds. [11], [12]) to give the shipper the benefit of a through contract against the initial carrier and to relieve it in case of loss or damage from being compelled at some distant point, inconveniently and expensively to pursue his remedy against the carrier actually responsible for the injury. (*Atlantic Coast Line R. R. Co.* v. *Riverside Mills,* 219 U. S. 186.)

Defendant places strong reliance upon the contention that it could not legally make a contract for a transportation service which its tariffs did not provide and therefore could not be liable for loss occurring between points for which it had filed no tariffs. While it is true that subdivision (e) of section 405 of the Interstate Commerce Act (U. S. Code, tit. 49, § 1005) forbids a freight forwarder to engage in a service unless the rates and charges have been duly filed and published, none of the cases cited by defendant go so far as to relieve a freight forwarder or a carrier from liability by reason of the absence of such filing and publication.

The cases cited by defendant in support of this contention are distinguishable. For example, *Chicago & A. R. R. Co.* v. *Kirby* (225 U. S. 155) merely holds unenforcible a carrier's special agreement to expedite a shipment where the established rates and schedules made no provision for such special service. Likewise, isolated expressions from cases such as *Keogh* v. *Chicago & N. W. Ry. Co.* (260 U. S. 156) and *Davis* v. *Cornwell* (264 U. S. 560) appear to forbid the making of special agreements, but what the court necessarily had in mind was the prevention of unjust discriminations and preferential treatment to shippers. Our attention has not been directed to any case holding that the failure to file and publish a tariff has been successfully invoked to relieve the forwarder, or indeed any carrier, from liability. Especially when that liability is predicated, as herein, upon negligence, we feel that a drastic holding that a carrier can be absolved from liability in a situation where it specifically undertakes to transport, merely by reason of its failure to file a tariff, is justifiable neither in the light of authority nor reason.

On the contrary, the invalidity of a contract of shipment under the Interstate Commerce Act does not operate as a bar to an action to recover for loss of, or injury to, the goods of a

shipper by negligence. (*Adams Express Co.* v. *Darden*, 286 F. 61, affd. 265 U. S. 265; *Southern Express Co.* v. *Essig Bros.*, 17 Ga. App. 657; *Chicago, R. I. & G. Ry. Co.* v. *Ranby*, 207 S. W. 157 [Tex.]; *Insurance Companies* v. *Carrier Companies*, 91 Tenn. 537, affd. sub nom. *Merchants' Cotton Press & Stor. Co.* v. *Insurance Co. of No. America*, 151 U. S. 368; *Kirby* v. *Chicago & A. R. R. Co.*, 242 Ill. 418; 9 Am. Jur., Carriers, § 167; 9 Am. Jur., Carriers, § 211; 13 C. J. S., Carriers, § 394; 10 C. J., Carriers, § 831, and cases cited.)

The fact that defendant had no tariff on file for the transportation of goods between Florida and Texas, might have justified it in refusing to reship the goods, but having undertaken to do so, the defendant cannot now escape liability. Should any argument of immunity on this ground be sustained, the court would in effect, be rewarding any freight forwarder who was remiss in filing tariffs.

Defendant's claim of invalidity of the agreement to ship to Texas could not have been asserted under the common law for the reason that prior to the enactment of the Freight Forwarders Act (U. S. Code, tit. 49, § 1001 *et seq.*) no tariffs were required to be filed. It was clearly not the intention of Congress by the provisions of subdivisions (11) and (12) of section 20 of the Interstate Commerce Act (U. S. Code, tit. 49, § 20), the Carmack Amendment, to lessen in the slightest degree the liability of common carriers. (*Cincinnati, N. O. & T. P. Ry. Co.* v. *Rankin*, 153 Ky. 730.) Nor can it be said analogously that it was the intention of Congress to limit the obligations of freight forwarders by the passage of the Freight Forwarders Act. Therefore, despite the requirement that tariffs be filed by freight forwarders, it was not intended that a shipment made in violation of this requirement should eliminate freight forwarders' liability for negligence.

There is no evidence of damage to the merchandise until its arrival in Texas. The evidence of the very slight damage, upon the arrival of the shipment in Tampa, described "Two with lids off; contents okay", is trivial and insignificant and is insufficient to show that the shipment was not in good order. The inference is that the goods were in the same condition when shipped from Tampa as they were on their arrival in Florida. The court finds that defendant contracted as a freight forwarder to ship the merchandise from Tampa to San Antonio. Plaintiff, having established that the goods delivered to the defendant in both Jersey City and Tampa were in good condition, their arrival in San Antonio completely damaged, has

established a prima facie case. The defendant not having satisfactorily rebutted the prima facie case, plaintiff is entitled to judgment for the stipulated amount, with interest. (*Pereira* v. *American Ry. Express Co.*, 207 App. Div. 692; *Perkel* v. *Pennsylvania R. R. Co.*, 148 Misc. 284, and cases cited; *Bonfiglio* v. *New York, N. H. & H. R. R. R. Co.*, 292 Mass. 287, and cases cited; 9 Am. Jur., Carriers, § 835.)